THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
FRANK J. JAMES, PLAINTIFF IN ERROR.

Argued April 14, 1921—Decided June 20, 1921.

1. The provisions in the constitution of New Jersey that the right of trial by jury shall remain inviolate and that the accused shall have the right to trial by an impartial jury, mean trial by a jury at common law, consisting of twelve men; but these constitutional provisions in nowise trammel legislative power with reference to the qualifications of jurors.
2. The statute of New Jersey in force at the time of the indictment and trial of the defendant, while not providing in terms that men shall be summoned as jurors, contains a distinct recognition of the common law qualification that men only shall be empaneled, by the use of the personal pronouns of the masculine gender "he" and "his" in describing the persons who shall be selected as jurors, and is not in violation of any provision of either the state or federal constitutions.
3. The nineteenth amendment to the constitution of the United States, adopted prior to the commission of the homicide by the

defendant in this case, emancipates women so far only as the right of suffrage is concerned, and does not operate in terms or by implication to qualify them as jurors: it requires legislation to do that; and this state, since the trial of the defendant, has enacted a statute which includes within the description of persons liable to jury duty, women as well as men.

4. To summon and return only men as jurors, when both men and women may be selected, is not error unless the omission to select women is made through bias, prejudice or other improper motive.

5. A defendant has no right to say what jurors shall try him; his right extends no further than to exclude jurors by whom he objects to being tried.

6. Even if the omission of the jury commissioners to return women upon the panel, were unlawful, and if the act recognizing the common law qualification of men only as jurors, were unconstitutional in that regard, still, the question cannot be raised by the defendant, a man, as he was not thereby injured; as a white man cannot urge as an infraction of his rights that the rights of another race have been assailed, so a man cannot complain because women are denied the same rights as men; such rights may be demanded only by members of the proscribed race or sex.

7. When the matters to be proved upon a trial are distinct, though component parts of a demand or a defence, the order of their production is wholly immaterial and always within the discretion of the court.

8. Upon the trial of a criminal case it is not error to permit the introduction of the prisoner's confession before the *corpus delicti* is proved.

9. In a prosecution for murder the *corpus delicti* may be proved by the confession of the prisoner which is corroborated by other evidence; the law does not require full proof of the body of the crime independent of such confession.

10. Where a man is feloniously stricken down in one county and dies as a result thereof in another county, his assailant may, under our statute, be indicted and tried in the county where stricken; and, on such trial, the order of proof, whether of confession of striking the blows in the county where the trial is had is first admitted and evidence of the *corpus delicti* in the county where the dead body was found, is afterwards admitted, or *vice versa*, is discretionary with the trial court and entirely immaterial.

11. The statute which empowers a jury, as part of their verdict of murder in the first degree "upon and after consideration of all the evidence," to recommend imprisonment of the convict at hard labor for life (in which case that punishment shall be imposed), does not permit the trial of a collateral issue—such as insanity in the family of a prisoner who does not plead insanity in himself as a defence in bar—to enable the jury

to decide to render a merciful verdict for a prisoner on trial for murder; an issue must be single and certain, and an irrelevant one will not be permitted to be tried.

12. A criminal defendant's mental condition need not be such as to enable him to realize the fullest extent of his acts before he may be convicted; the law presumes a man to be sane,, and if the contrary exists thereby defeating this natural presumption, it must be shown by the party who alleges it, and, when insanity is set up as a defence, the test of responsibility is the capacity of the defendant at the time of the doing of the act complained of, to distinguish between right and wrong, with respect to that act.

13. The Crimes act makes murder which shall be committed in perpetrating or attempting to perpetrate any robbery (and certain other offences) murder in the first degree; and, while insanity is a defence to any murder, nevertheless, a homicide committed in the perpetration of robbery, if murder at all, is by the statute made murder in the first degree, and, as the evidence justified the conviction of the prisoner, who was engaged in robbery, of the crime of murder in the first degree, the jury could not have reduced the grade of the homicide to murder in the second degree.

On error to the Camden Court of Oyer and Terminer.

For the plaintiff in error, *Harris & Harris*.

For the defendant in error, *Charles A. Wolverton,* prosecutor, and *Albert E. Burling,* assistant prosecutor of the pleas.

The opinion of the court was delivered by

WALKER, CHANCELLOR. The plaintiff in error was indicted jointly with Raymond W. Schuck for the murder of David S. Paul, on October 5th, 1920. The court ordered that separate trials be accorded to each of the defendants. The plaintiff in error was thereupon tried and convicted of murder in the first degree, without recommendation. He brings that conviction before this court for review under section 136 of the Criminal Procedure act on assignments of error and specifications of causes for reversal.

The assignments of error are six in number, so are the specifications of causes for reversal; and the assignments

and specifications are the same in substance, although somewhat varied in words in some instances. Succinctly stated they are as follows:

1. The said Frank J. James, the defendant, on being called to the bar interposed a challenge to the array upon the ground that the commissioners of juries of the county of Camden deliberately failed and refused to select any women for jury duty, although there were five thousand or more women within the county qualified for jury service, but selected only men; which was and is contrary to the rights of the defendant under the constitutions of the United States and the State of New Jersey and of the statute of said State of New Jersey in such case made and provided.

2. The court below erroneously admitted the alleged confession of the defendant before the *corpus delicti* had been proven. The state was permitted to offer the alleged confession for the purpose of proving the *corpus delicti.*

3. The court below erroneously refused to order the prosecutor of the pleas to furnish counsel for the defendant a copy of his alleged confession or statement before the same was offered in evidence in order to allow counsel to inspect the same to ascertain in advance whether it contained incompetent or illegal matter.

4. The court below erroneously refused to allow plaintiff in error to prove his family history showing that there had been in the immediate family a number of persons who were insane. That the jury was entitled to know the family history in order that they might consider that in arriving at a recommendation of imprisonment for life under the law of New Jersey of 1919.

5. The court below overruled the motion on behalf of the defendant to direct a verdict for the reasons as therein stated. (1) Because the court overruled the challenge to the array. (2) Because the *corpus delicti* was not proven except by the confession of the defendant. (3) Because the *corpus delicti* was not proven. (4) Because no crime was proven to have been committed in Camden county. (5) Because the court overruled the offer to prove the insanity of members of the

defendant's family in order that the jury might consider the same in order to arrive at a conclusion as to whether a recommendation of imprisonment for life should be made.

6. The court erroneously refused to charge the request on behalf of the defendant as follows: If his mental condition was such as to render him incapable of forming the specific intent to kill, which is the essential ingredient of murder of the first degree, the prisoner will not be entitled to acquittal, but his offence will be murder of the second degree.

These assignments of error and specifications of causes for reversal will be considered in the order in which they are thus raised.

*First.* Upon being arraigned the defendant interposed a challenge to the array of jurors. The ground of the challenge was, that in selecting the petit jury list of five hundred names no women were chosen, and in the selection of the names from the list to be placed in the wheel no women were chosen; and that no women were on the panel. This is asserted to be an invasion of the defendant's constitutional rights, because, it is said, that nowhere in the constitution of the United States is it provided that jurors should be men, while it is therein provided that a defendant shall be tried by an impartial jury; and that our state constitution provides for trial by an impartial jury, and that our statute has determined the qualifications of jurors thus: *"He* shall be a citizen of this state," &c.

The constitution of New Jersey relating to jury trials (article 1, sections 7, 8), omitting an irrelevant provision, reads:

"Sec. 7. The right of a trial by jury shall remain inviolate.

"Sec. 8. In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury."

This constitutional guarantee, as to the right to jury trial, has been held to be trial by a jury at common law. *State* v. *McCarthy,* 76 *N. J. L.* 295, 297; *State* v. *Brown,* 62 *Id.* 666, 676, 678. A common law jury consisted of "twelve free and lawful men." 3 *Bl. Com.* 352. Women could not serve as jurors at common law except upon a jury to try an issue

under a writ *de ventre inspiciendo,* whether a woman be with child or not. 3 *Bl. Com.* 362. A petit or traverse jury is a body of twelve *men* who are sworn to try the facts of a case as they are presented in the evidence. *Cooley Const. L.* (*7th ed.*) 455. But our constitutional provisions in nowise trammel legislative power with reference to the qualifications of jurors.

Our statute relating to the qualifications of petit jurors is found in 3 *Comp. Stat., p.* 2965, as follows:

"6a. Sec. 1. Every person summoned as a grand juror in any county in this state, and every petit juror returned for the trial of any action or suit of a civil or criminal nature, shall be a citizen of this state, and reside within the county from which *he* shall be taken, and above the age of twenty-one years and under the age of sixty-five years, and shall not, at the time of *his* selection be an official having, directly or indirectly, any official interest in or connection with the administration of justice. And if any person who is not so qualified shall be summoned as a grand juror or as a juror on the trial of any such action in any of the courts of this state, or if any person shall be summoned as a petit juror at any stated term of any court of this state, who has served as such at any of the three stated terms next preceding the day to which he may be summoned, it shall be good cause of challenge to any juror, who shall be discharged upon such challenge being verified according to law or on *his* own oath or affirmation in support thereof; provided, that no exception to any such juror on account of *his* citizenship, age or any other legal disability shall be allowed, if *he* has been sworn or affirmed."

While this statute does not provide in terms that men shall be summoned as jurors, it contains a distinct recognition of the common law qualification that men only shall be empaneled by the use of the personal pronouns of the masculine gender "he" and "his." And it is not perceived how the sheriff could have summoned women under the law of this state as it stood at the time of the proceedings against the prisoner in this case without violating the oath of office

which as sheriff-elect he was required to take according to the act concerning sheriffs (4 *Comp. Stat., p.* 4839, § 3), that he "will truly, faithfully and impartially and with all convenient speed, summon, impanel and return, or cause to be summoned, impanelled and returned, good and lawful men for jurors, able and sufficient and not suspected or procured, as is or shall be directed by law."

The jury commissioner appointed by the Chancellor, who acts with the sheriff under the supplement to the act concerning juries known as the Chancellor-Sheriff Jury act (*Hudspeth* v. *Swayze,* 85 *N. J. L.* 592), is required, before entering upon the discharge of his duties, to take an oath faithfully and impartially to execute the duties of his office according to the best of his skill and understanding; and he is presumed to know and understand the law. That these required oaths were taken by the sheriff and the jury commissioner and that they were subscribed and filed as required by the acts mentioned, is to be conclusively presumed, as it is not even suggested that they were not. The jury commissioner discharged his duty when, in collaboration with the sheriff, he summoned, or rather participated in the summoning of *men* as jurors, for such was the law.

At the time of this homicide (October 5th, 1920) and of the indictment (November 16th, 1920) and trial of the defendant (December 16th, 1920), the nineteenth amendment to the federal constitution enfranchising women had been adopted (August 26th, 1920) and was part of the law of the land. It reads as follows:

"The rights of citizens to vote shall not be denied or abridged by the United States or by any state on account of sex.

"Congress shall have power to enforce this article by appropriate legislation."

It will be observed that this part of the organic law makes no provision whatever about jurors. It emancipates women only so far as the right of suffrage is concerned, and leaves no impediment in the way of the legislature clothing them with capacity to become and serve as jurors; and it may

well be that the legislature possessed that power before the adoption of this amendment. That, however, is a question with which we do not have to deal. But the amendment itself does not operate in terms or by implication to qualify women as jurors. It requires legislation to do that.

Justice Depue, in *Brown* v. *State,* 62 *N. J. L.* 666, went into the history of trial by jury and showed conclusively that the qualification of jurors is a matter resting in legislative enactment.

It is contended on behalf of the plaintiff in error that the jury commissioners in drawing the jury in this case, excluded women as a class, and that therefore the panel was illegal; but, as shown, neither by the constitution nor any statute of this state, was it provided that women should or might be jurors. By the common law they are men, and such descriptions of jurors as are found in our statutes relate only to men, as already remarked.

The nineteenth amendment to the federal constitution, as above stated, makes no provision whatever with reference to the qualification of jurors. It confers alone the right of suffrage. The spirit of equality of the sexes which it breathes moved the legislature of New Jersey in 1921 to amend our act concerning jurors so as to include within the description of persons liable to be summoned as grand and petit jurors, women as well as men. *Pamph. L.* 1921, *p.* 50. This is not a declaratory, but a remedial, statute, and clearly indicates that women had to be qualified by legislative enactment in order to be summoned, and to serve, on juries in this state.

The Supreme Judicial Court of Massachusetts recently delivered an opinion to the senate and house of representatives of that commonwealth, that their constitution and statutes did not operate to give that right or impose that duty. Their statute is different from ours and would be more favorable to the contention of the prisoner in this case. And the court, among other things, said:

"The words of *G. L., ch.* 234, § 1, to the effect that 'a person qualified to vote for representatives to the general court shall be liable to serve as a juror,' are broad enough as matter of

mere verbal analysis, in connection with *G. L., ch.* 51, § 1, conferring such right to vote upon women, to include women as well as men. Those words, however, like the words of every statute, are not to be interpreted in their simple literal meaning, but in connection with the history of the times and the entire system of which the statute in question forms a part, in the light of the constitution, of the common law and of previous legislation upon the same subject. The provisions of law prescribing the qualifications of those subject to jury service have been in almost the same essential words since the adoption of the constitution. No sound ground for the contention that women could be jurors existed until after the adoption of the nineteenth amendment to the federal constitution. It cannot be thought that the general court by re-enacting in *G. L., ch.* 234, § 1, the description of those liable to be drawn as jurors, in words previously used and without change, intended to include women.

"This conclusion is confirmed by the facts that the statute contains no reference to exemption of the large number of women who manifestly ought not to be required to serve as jurors, that no provision is made for the convenience of women in court houses, some of which are already overcrowded and unfit for their accommodation, and that the jury of 'men' is continued in *G. L., ch.* 123, § 57, as applicable to the cases there described. It is a familiar rule of statutory construction that the re-enactment of an earlier statute does not affect its meaning or enlarge its scope in the absence ·of definite indication of a legislative purpose to that end."

See *In re Opinions of the Justices,* 130 *N. E. Rep.* 684 (not yet officially reported).

In the case of *People* v. *Manuel,* 41 *Cal. App.* 153, an error alleged was, that the sheriff failed and intentionally omitted to draw men on the jury, but confined himself to a certain class of citizens, namely, women; and that in so doing he was biased and prejudiced in summoning the jury. But the court held that the persons summoned were good and lawful persons and in every way competent to act as jurors, and that that was not questioned; that there was nothing in the

record which tended to show the slightest bias on the part
of the officer in summoning the jurors, and, on the contrary,
it appeared that he acted with entire impartiality and with-
out prejudice to the substantial rights of the defendant; that
considered as jurors the law makes no distinction between
men and women, and subject to qualifications applicable alike
to each they were equally competent to act as jurors; hence
it could not be said that the sheriff in summoning all women
confined himself to a certain class as distinguished from
another class, any more than if he had summoned all men,
or a mixed jury composed of a greater number of either sex
than the other.

Under the act of our last legislature permitting women as
well as men to serve on grand and petit juries, it is not re-
quired that an even number of each sex shall be summoned,
so that, in nearly every instance hereafter there will doubt-
less be a preponderance of either men or women; and on
traverse juries, by the exercise of the right of challenge, in
many cases our juries will in the future, as in the past, be
composed wholly of men, and in other cases hereafter wholly
of women. This, in and of itself, would not be error. Error
would exist only if the commissioners, through improper
motives, excluded members of one or the other sex in the
drawing of the general panel.

On the challenge to the array in this case, which of course
was made before the trial was gone into, Sheriff Corson and
Commissioner Lennon, the commissioners who drew the jury,
were examined as witnesses. The sheriff testified that he
put no women on the jury because he thought that they could
not be properly taken care of at the court house; that he
did not do so with the idea that he was discriminating against
anybody; that the jury was drawn without any thought of
the defendant, James; that the jury was drawn from the
great body of citizens of the county and without bias against
any citizens on account of race, creed or sex, and that he
used his best judgment. Commissioner Lennon testified that
he made up the list without any regard to race, creed, color,
condition or sex; that he did not put any women on or keep

.any off; that he used his best judgment, which was not in any way prejudiced against the defendant.

A defendant has no right to say what jurors shall try him. His right extends no further than to exclude jurors by whom he objects to being tried. This court recently, in *State* v. *Langhans,* 95 *N. J. L.* 213, observed (at *p.* 216) :

"He (defendant) was entitled to a trial by a fair and impartial jury. He was entitled in the selection of the jury to exercise the right of challenge which gives to a defendant the opportunity of saying that he shall not be tried by some particular jurors. The right of challenge, however, is the right of exclusion, not a right of selection. It does not give to a defendant the right of saying what particular jurors shall try him."

In *State* v. *Grilli,* 179 *N. Y. Supp.* 795, where a state constitutional amendment enfranchising women had been adopted, an application to place women's names on jury lists was made, and it was held:

"For over fifty years, the people generally throughout the country, surely in this state, the courts and legislatures have proceeded upon the idea that women were not entitled as citizens to act as jurors. This long-continued and undisputed practical construction of a constitutional provision is, in effect, a direct judicial construction. * * *

"While the doctrine stated may be subject to abuse and a ready refuge against the assumption of responsibility, in this case the course of conduct of the federal and state governments in limiting jury service to males has been so unvaried, thousands upon thousands of cases both civil and criminal have been tried with only male jurors with but little objection for so many years, to adopt any other course than to follow this rule of construction would be disregarding that which is practically, if not entirely, conclusive." See also *Harland* v. *Territory,* 3 *Wash.* (*Ter.*) 131; *Ex parte Mana,* 172 *Pac. Rep.* 986 (not yet officially reported).

However, even if the omission of the jury commissioners to return women upon the panel from which the jury that tried the defendant was selected, was unlawful, and our jury act

recognizing the common law procedure of drawing and summoning only men as jurors, was unconstitutional, as contended for, still, the question cannot be raised nor the point made by the defendant, a man, as he was not thereby injured. It was long ago held that where colored men were not summoned and returned on jury panels members of that race could raise the objection that they were discriminated against. See the federal and state cases cited in *McKinney* v. *State*, 3 *Wyo.* 719. But white men could not object that colored men were not on the juries that tried them.

In Wyoming the constitutional provision was, like ours, that "the right of trial by jury shall remain inviolate," and their statute in force restricted the qualification of jurors to male citizens having the qualification of electors. There was also another constitutional provision that "the rights of citizens of the State of Wyoming to vote and hold office shall not be abridged or denied on account of sex;" also, "both male and female citizens of this state shall equally enjoy political, civil and religious rights and privileges." And the Supreme Court of the state in 3 *Wyo.* 719, observed that no provision had been made by statute for the admission of female electors to the jury box, unless their constitution can be so construed as to confer the right without legislation.

The court said (at *p.* 726):

"The plaintiff in error asserts a right or privilege of having members of the opposite sex, as well as those of his own sex, to determine his rights, because they are unconstitutionally excluded from enjoying a right granted to them, and not because any one of his own sex is denied the right. If women have the right, if it is a right, to serve as jurors, and to 'assist in the administration of justice' thereby, it seems that no one but a woman—one of the class or sex whose rights have been invaded—can assert that right. It must be demanded by one who has been denied the equal protection of the law, and a civil or political right or privilege of which she, in common with her sex, has been deprived. The courts will not listen to an objection made to the constitutionality of an

act by a party whose rights it does not affect, and who there-fore has no interest in defeating it.  *Cooley Const. Lim.* 164."

And at *p.* 728:'

"As a white man cannot urge as an infraction of his rights that the rights of another race have been assailed, so a member of one sex cannot complain because the members of another sex are denied the same rights as persons of his sex. The deprivation of the rights, privileges or immunities of a class, race or sex, which are guaranteed by the organic law, can only be determined in a proceeding instituted by one of the proscribed class, race or sex, where relief may be given directly to the oppressed one in his suit and upon his demand. A woman must be on trial to demand the rights of her sex, or to assert that they have been unjustly or unconstitutionally discriminated against. A man cannot assert her right for her in his cause. He is not the party whose rights are affected, and he has no interest in defeating an unconstitutional or invalid law, affecting those of the opposite sex. Without intimating, then, what our views might be as to the meaning and force of the constitutional provision providing that the members of both sexes should equally enjoy all civil, political, and religious rights and privileges, when such a question is fairly and properly presented; without passing in this case upon the right, duty or eligibility of female citizens to serve as jurors, where they possess the same statutory qualifications as men; without construing the various constitutional provisions bearing directly or remotely upon the matter; without attempting to say whether the constitutional provision conferring the right or privilege, if it is so conferred, requires legislation to clothe it with force and vitality, we decide but this, and that is sufficient: that the plaintiff in error, a man, cannot claim that any civil, political or other right or privilege of his or of his sex is infringed, invaded or annulled by a statute excluding members of the other sex from the jury which tried him, or which by its terms confines the selection of jurors trying him to those of his own sex. He has been tried by his peers. He has not been denied the equal protection of the law. He has not been discriminated against

because of his sex. There was no error in the refusal of the trial court to order a removal of the cause to the federal court, or in overruling the challenge to the array, because of the fact that the jury that tried the plaintiff in error was composed exclusively of members of his own sex, or in overruling the motion in arrest of judgment based on this ground alone."

This decision is entirely apposite on the same question here involved, namely, objection by a man that women were entitled to serve, but were not returned, upon the jury that tried him. The case is a well considered one resting on authority and right reason, and its doctrine should be adopted and applied here. Upon the authority of *Lang* v. *Bayonne,* 74 *N. J. L.* 455, the prisoner cannot be heard to say that our statute which made no provision for summoning women jurors, is unconstitutional and an invasion of his rights, as he is not injured thereby.

*Second.* The next point to be considered is the objection that the confession of the defendant was inadmissible before the *corpus delicti* was proved; and that the *corpus delicti* was not proved otherwise than by the confession of the defendant. The first objection here stated concerns only the order of proof. That is a matter within the discretion of the court. *Donnelly* v. *State,* 26 *Id.* 601; *Bodee* v. *State,* 57 *Id.* 140. And where the matters to be proved are distinct, though component parts of a demand or defence, the order of their production is wholly immaterial. *Lusk* v. *Colvin,* 8 *Id.* 62.

In the case of *West* v. *State,* 22 *N. J. L.* 212, upon a conviction for forgery, the defendant brought error and the Supreme Court decided (at *p.* 238) :

"The second exception is, that the court admitted evidence to show that the signature, Caleb Shreve, as one of the subscribing witnesses to the deed charged to be forged, was not the signature of Caleb Shreve the grandfather of the witness, though the identity of the subscribing witness to the deed with the grandfather of the witness had not been established.

"The decisive answer to the objection is, that the evidence is competent as far as it goes; though not an entire chain, it is a complete link in the chain. The fact stated was com-

petent and relevant. To how much weight it might eventually be entitled, would depend, doubtless, upon how strictly the state identified the subscribing witness with the person referred to."

A defendant on trial for a crime is not harmed if his confession is introduced in evidence and then the *corpus delicti* is proved, for if the order of proof were reversed and the *corpus delicti* were first established and then the confession, the result would not be different. It is the *corpus delicti* plus the confession, or the confession plus the *corpus delicti,* that makes the case. Again, a defendant is not harmed if his confession is first introduced, because if that were not followed by proof of the *corpus delicti* the defendant would go acquit, if that were all there were to the case. But, the objection here that the confession was admitted before the *corpus delicti* was proved is untrue in point of fact. The testimony of Duncan, Parker, Paul (son of deceased) and Stem, presently to be adverted to, establishing the *corpus delicti,* was given before any evidence of defendant's confession was introduced. The assertion that the *corpus delicti* was not proved independently of the defendant's confession, is not a fact. George W. Duncan testified that on October 16th, 1920, he was on a hunting trip with two companions in the vicinity of Fisher's dam, near Irick's Causeway, Burlington county, where they came upon automobile tracks and footprints which looked suspicious, and upon investigation they found a spot that looked as though something had been buried there. The witness and one of his companions dug and unearthed the body of a man in a shallow grave. Ellis Parker, county detective of Burlington, testified that he knew David Paul, the deceased; that on October 16th, 1920, he was notified that a body had been found near Irick's Causeway, to which place he repaired and found the deceased to be David Paul. He also described certain wounds upon the body. Harry Paul that night at the morgue saw and identified the body as that of his father. Dr. Stem, the county physician of Camden, made an examination of Paul's body and testified concerning it as follows:

"The wound that caused death was a compound fracture of the skull. There was an opening in the skull about five inches long on the left side, about two inches above the ear, just about five inches long, extended down into the brain tissue. That was the direct cause of death. There was an incised wound on the inner side of his right arm, forearm, about four inches above the wrist, about an inch and a half long, quite deep. * * *

"There were five incised wounds on top of the head, on the left side, following over and into, two inches long, and went down to the bone; there was a contusion of the right side of the face, high up in the templar region down from the lower jaw, quite a large swelling there, a large contusion, and the crevis of the lower jaw was broken at that point."

There was much more evidence, irrespective of the defendant's confession, to the effect that Paul had met a felonious death. And in this situation, namely, proof of the death of a person by foul means and the confession of a party that he murdered the man whose death is so proved, the law of this state is entirely settled; for, in *State* v. *Kwiatkowski,* 83 *N. J. L.* 650, this court held that the only limitation upon the use as evidence against him of a prisoner's confession of murder, voluntarily made, is the want of proof of *corpus delicti.* If death, through criminal agency, be proved, and a man confesses to having caused that death, he may be convicted of murder on his confession. Furthermore: In *State* v. *Banusik,* 84 *Id.* 640, this court held that in a prosecution for murder the *corpus delicti* may be proved by the confession made by the defendant which is corroborated by other evidence. The law does not require full proof of the body of the crime independent of such confession. These two authorities are entirely dispositive of the defendant's contention concerning the *corpus delicti;* but, if anything were wanting on that score it is supplied by the admission of defendant's counsel on the argument, his brief containing this statement:

"Nothing was heard of Paul until October 16th, eleven days after his disappearance, when his body was found by

two gunners, buried in a shallow hole near Irick's Causeway in the pines of Burlington county, about thirty miles from Camden. The body showed that he had been killed by blows on his head, and that his death from violence was not self-inflicted."

As seen above, the *corpus delicti* was proved independently of the confession, but if it were not, as contended for by the prisoner, still, the confession was so thoroughly corroborated by other evidence that both together afforded full proof of the body of the crime.

The further point, however, is made, that proof of the murder in Camden county is required before the prisoner's confession could lawfully be offered in evidence. This contention is devoid of merit.

Assuming that the death of Paul occurred in Burlington county, where he was found dead, still indictment and trial in Camden county, where he was feloniously stricken, if the proof established that fact, and it did, was legal, and the order of proof, whether of confession first and *corpus delicti* afterward, or *vice versa,* was discretionary with the trial court and entirely immaterial.

Chief Justice Beasley in writing the opinion in the Supreme Court in *State* v. *Wyckoff,* 31 *N. J. L.* 65, said (at *p.* 68) :

"The general rule of law has always been that a crime is to be tried in the place in which the criminal act has been committed. It is not sufficient that part of such act shall have been done in such place, but it is the completed act alone which gives jurisdiction. So far has this strictness been pushed that it has been uniformly held, that if a felony was committed in one county, the accessory having incited the principal in another county, such accessory could not be indicted in either. This technicality, which, when applied to the several counties of the same kingdom or state, appears to have little to recommend it, was nevertheless so firmly established that it required the statute of 2 and 3 *Edw. VI., c.* 24, to abolish it, and this statute has been re-enacted in this state. *Nix. Dig . p.* 199."

This act, as amended, is to be found in 2 *Comp. Stat., p.* 1839, § 59, and provides that whenever any person shall be feloniously stricken or poisoned in one county and shall die of the same stroke or poisoning in another county, the offender may be indicted and tried in either county.

That Paul was feloniously stricken in Camden county is established by the confession which was voluntarily made, as the prisoner's counsel conceded. This proof came after the *corpus delicti* in the county of Burlington was established, but, as shown above, this concerned only the order of proof and of itself was immaterial. When the case closed it was proved by competent evidence that the deceased had been feloniously stricken in Camden, and that his dead body was found in Burlington, county. In which county he died did not appear. He expired in the automobile in which he was feloniously stricken down and in which he was being conveyed from Camden to Burlington. If he died in Camden the offence was complete there; if in Burlington, the culprit was, nevertheless, subject to indictment and trial in Camden under the statute. It would have been the same if he had died out of the state as our act (2 *Comp. Stat., p.* 1839, § 60) provides that where any person shall be feloniously stricken within the jurisdiction of this state and shall die of such at any place out of the jurisdiction, an indictment found in the county in which such stroke shall happen shall be good and effectual, &c. This statute was construed and applied in *Hunter* v. *State*, 40 *N. J. L.* 495.

*Third.* The point that the trial judge erroneously refused to order the prosecutor of the pleas to furnish counsel for the prisoner a copy of the confession (which was verbal, although taken down stenographically and afterward written out), is neither briefed nor argued, is without the slightest legal foundation and will not be further noticed.

*Fourth.* It is argued on behalf of the prisoner that it was error for the judge to refuse to admit evidence of the prisoner's family history, which it was claimed would show a taint of insanity, which the prisoner must have inherited. This was not offered as an absolute defence of insanity, but

only that the jury could take it into consideration on the question whether or not to recommend imprisonment for life under the amendment of the Crimes act, *Pamph. L.* 1919, *p.* 303 (in which event no other punishment could be imposed). The amendment empowers the jury, as part of their verdict of murder in the first degree, "upon and after consideration of all the evidence," to recommend imprisonment at hard labor for life. This point was argued in the most general way, to the effect that the jury might have been led by the proffered testimony to have mitigated their verdict which was practically a sentence of death, to what would have been practically a sentence of imprisonment for life. We say "practically" because the jury does not impose the sentence, but finds the verdict upon which the prisoner is sentenced by the court, which sentence, however, in a verdict of murder in the first degree is circumscribed by the law to that following such verdict and without any discretionary power in regard thereto being vested in the judge.

The legislature could never have intended by this act to open the door to the trial of a collateral issue—such as insanity in the family of a prisoner who had not pleaded insanity in himself as a defence in bar—to enable a jury to decide to render a merciful verdict for a prisoner on trial for murder, as an examination of the legislation on the subject will demonstrate. The amendment of 1919 was not the first of its kind. The provision for recommendation of life imprisonment first appeared in 1916 (*Pamph. L., p.* 576), which provided that the jury at the time of rendering a verdict of murder in the first degree might recommend imprisonment at hard labor for life, in which case that punishment should be inflicted. There was no provision that the recommendation should be upon consideration of the evidence; and this court, in *State* v. *Martin,* 92 *N. J. L.* 436, held that the facts upon which a conviction of murder of the first degree rests, had no necessary connection with the recommendation, which was discretionary and required no consideration of the facts, and that an instruction to the jury that they might consider the testimony tending to show the character of the crime,

&c.. was not permissible comment on the evidence, and was error. The opinion was filed March 3d, 1919. The legislature was then in session and passed the amendment of that year (*Pamph. L.* 1919, *p.* 303, *supra*), which was approved April 12th, 1919, and provided that such recommendation as is here being discussed should only be made "upon and after consideration of all the evidence," meaning, of course, all of the evidence adduced between the state and the prisoner on the issue of guilt or innocence. Here is discoverable an unmistakable legislative intent to change the law as laid down in the decision of State *v.* Martin, which construed the amendment of 1916 as not requiring consideration of the facts of a given case in order for a recommendation to be made. See also *State* v. *Carrigan,* 94 *N. J. L.* 566.

All acts of the legislature are passed with reference to the construction put upon prior acts by the courts. 36 *Cyc.* 1153; *Frost* v. *Barnert,* 56 *N. J. Eq.* 290 (at *p.* 292).

It is a general principle that an issue must be single and certain and that an irrelevant one will not be permitted to be tried. This rule precluded the proffered evidence, and its exclusion was correct.

*Fifth.* The next assignment of the prisoner is that the trial judge refused to direct a verdict at the close of the case, for the following reasons: (1) Because the court overruled the challenge to the array. (2) Because the *corpus delicti* was not proven except by the confession of the defendant. (3) Because the *corpus delicti* was not proven. (4) Because no crime was proven to have been committed in Camden county. (5) Because the court overruled the offer to prove insanity of members of the family of the defendant.

This assignment as such, was not briefed or argued by the prisoner's counsel, and was, consequently, abandoned. But each numbered subdivision was the subject of other assignments which were argued and have been considered and disposed of above.

*Sixth and Lastly.* It is contended on behalf of the prisoner that the judge erroneously refused to charge the jury that if his mental condition was such as to render him incapable of

forming a specific intent to kill, his offence would be murder in the second degree. The only argument advanced to support this is, that every defendant on trial must be of such mental condition that he is able to know the fullest extent of the result of his acts, before he may be convicted. It is not the law that a defendant's mental condition must be such as to enable him to realize the *fullest* extent of his acts. The full extent of the result of a murder extends far beyond the fact itself, and the immediate parties to it. Its ramifications vary in various cases. In *Wilson* v. *State,* 60 *N. J. L.* 171, one question was as to the effect of voluntary intoxication on the degree of the crime committed by the defendant, and this court held (at *p.* 184) that if by law deliberation and premeditation are essential elements of the crime (and they are in murder), and by reason of drunkenness *or any other cause* it appears that the prisoner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not been committed; there is a failure on the part of the state to prove the crime into which premeditation must enter. In the case at bar intoxication was not interposed as a defence to the degree of the prisoner's crime, and, furthermore, there was no proof that the defendant was intoxicated. To reduce the grade of the crime reliance is probably rested, in the exception under consideration, upon the theory that the jury might have found that the prisoner was not of sound mind. But this could not be because no evidence was laid before the jury tending to show insanity in the prisoner. The law presumes a man to be sane, and if the contrary exists thereby defeating this natural presumption, it must be shown by the party who alleges it. *State* v. *Hill,* 65 *Id.* 626. Even if insanity had been set up as a defence in this case, the test of responsibility would be the capacity of the defendant at the time of the doing of the act complained of, to distinguish between right and wrong, with respect to that act. *Mackin* v. *State,* 59 *Id.* 495. By the right and wrong test, which is firmly imbedded in the settled law of our state (*Id.* 497) the prisoner was clearly guilty, if the facts of the case made

against him were true, and they were so found by the jury upon abundant evidence.

There is still another answer to this contention: It is that the Crimes act (*Comp. Stat., p.* 1779, § 106) makes murder which shall be committed in perpetrating or attempting to perpetrate any robbery (and certain other offences) murder in the first degree; and this provision is repeated (*Id.,* § 107) in which the degrees of murder are defined. These provisions of our criminal law are so inexorable that if two persons agree to rob another (as in this case) and one strikes a blow that results in the death of the victim, both are guilty. *Roesel* v. *State,* 62 *N. J. L.* 216, 222. These statutory enactments are but declaratory of the common law. See 4 *Bl. Com.* 200. While insanity is a defence to any murder, nevertheless, a homicide committed in the perpetration of robbery, if murder at all, is by the statute made murder in the first degree; and, as the evidence in this case justified the conviction of the prisoner, who was engaged in robbery, of the crime of murder in the first degree, the jury could not have reduced the grade of the homicide to murder in the second degree. The trial judge was therefore right in refusing to charge the instruction requested by the defendant.

Upon this whole matter we are clearly of opinion that the judgment under review should be affirmed.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, VAN BUSKIRK, JJ.　14.

*For reversal* — None.