STATE, Respondent, v. ROBUCK, Appellant.

No. 9155.

Submitted April 22, 1952. Decided July 31, 1952.

Rehearing denied October 21, 1952.

248 Pac. (2d) 817.

Mr. Charles F. Moses, Billings, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Thomas F. Joyce, Asst. Atty. Gen., Mr. Charles B. Sande, County Atty., Mr. Jerome Anderson, Deputy County Atty., Billings, for respondent.

Mr. Moses and Mr. Joyce argued orally.

MR. JUSTICE ANGSTMAN:

Defendant was convicted of the crime of robbery alleged to

have been committed on April 8, 1951, by forcibly taking $4 from Fred Meyer.

The evidence shows that the robbery was accomplished in an automobile owned by defendant. Meyer in company with Mr. and Mrs. Wade went to the Elmo Club in Billings for dinner. Meyer there met defendant and after dancing with her asked her to join the party which she did. Later they left to go to the Windmill Tavern. Meyer rode with defendant in her car and the Wades drove his car.

There was evidence that defendant drove her car with such speed that the Wades were not able to follow her and so they went to the Grand Hotel. Defendant stopped at the Windmill Tavern but it being after hours, it was closed for drinking and so they proceeded to highway No. 10, and as defendant approached the underpass on the west side of Billings, Richard Wayne Bungard, who was in the back seat of the car without Meyer knowing it, rose and struck Mr. Meyer on the head with a pistol.

Bungard then ordered defendant to drive west toward Laurel. This she did. After proceeding a short distance on No. 10, defendant acting under orders from Bungard turned off the main road and stopped the car. Meyer thereupon tossed his money on the seat of the car and jumped out.

Bungard pleaded guilty to the robbery and was called as a witness for the state.

Defendant by her first assignment of error contends that she ▇▇▇ was unduly restricted in her cross-examination of the witness Bungard.

Bungard testified that on Saturday afternoon, April 7, 1951, defendant picked him up at his home in Laurel. They went to Columbus in her car where he wanted to see about obtaining a job. Upon returning from Columbus they went to a show in Billings. After the show they went to the St. Louis Cafe for supper. From there they went first to the Beacon Club and then to the Elmo Club. He then went to the car and stayed

there and defendant and Meyer came out later. He was then asked what happened and he answered:

"A. Well, I had had it in my—I was talking something about robbing—I do not know—I did not clearly have it in my mind to rob anybody, but I got to thinking about it, and the more I thought about it, the more I did not want to do it.

"Q. Had you talked about the robbery with Mrs. Robuck at all? A. Yes.

"Q. Where had you talked with her about it? A. After leaving the Beacon.

"Q. What conversation was had between you and Mrs. Robuck? A. I mentioned to her a way to get some easy money. I do not know what got into me—drinking and everything else. So we went—she did not go for it, you know, a joke, and we forgot all about it. She got into the car with this other man and went driving down the highway there, going toward town, and stopped at the Windmill. After they left the Windmill, he made a pass—when he made those advances to her, I hit him on the head."

Thereupon the county attorney asked the right to cross-examine Mr. Bungard because of asserted difference between his testimony and the story previously told by him. He produced a document designated Exhibit 4, purporting to be a statement signed by Bungard and asked a question regarding it. Objection was made to the question and the court announced the noon recess. Upon resuming after the recess the following proceedings took place.

"Mr. Sande: Now, Your Honor, to obviate opposing counsel's objection, I withdraw my examination of the witness in this regard and will reframe my questions.

"The Court: Let it be stricken. You may proceed.

"Q. You testified, Mr. Bungard, you were with Mrs. Robuck at the Beacon Club? A. Yes, sir.

"Q. And talked about a robbery with her? A. Yes.

"Q. Tell the jury what your conversation was. A. Well, we started—we was talking there, and we did not have much

money, and so I mentioned I thought I had an idea to get some pretty easy, but she did not want to do it. And she did not know whether she did or not. So I asked her to go in and pick up some guy and bring him to the car and I would stick him up. We were going out to the Elmo Club—

"Q. This is at the Beacon Club you had this first conversation? A. Yes.

"Q. Did she agree with you at that time to carry out the robbery as you planned it? A. Well, one.

"Q. What do you mean by that? A. If I figured on one— not more than one.

"Q. One robbery? A. Yes.

"Q. Did I understand your answer to be she did agree with you to carry out the one robbery? A. Not at first, but she did a little later after I talked with her a little while."

On cross-examination of Bungard the following took place:

"Q. You testified this morning that you started a conversation that was joking at first. A. Yes, sir, that is right.

"Q. You stated under oath 'she did not want to do it?' A. That is right.

"Q. 'Then we forgot all about it.' You made those statements this morning? A. Yes.

"Mr. Sande: Your Honor, I believe that testimony was stricken and that it is not now in the record.

"The Court: Yes, that was all stricken.

"Mr. Moses: He is offering to testify under oath, your Honor, and he has made those statements under oath. Now I am going to ask him if he made those statements, on cross-examination.

"The Court: But—

"Mr. Sande: Your Honor, this would be outside the scope of the direct examination.

"The Court: You may ask him what you wish on cross-examination, but not with reference to testimony that has been stricken from the record. In other words, there is now no record. It has been stricken.

"Mr. Moses: I can ask him if he made that statement and—

"Mr. Sande: Your Honor, I still insist that it is outside the scope of the direct examination.

"Mr. Moses: The question of what was—

"The Court: You may ask him, whether it is established or not, that, and is it a fact—

"By Mr. Moses: Q. Is it a fact that at that time you suggested in a joking manner that you were going to rob somebody, is that right?

"Mr. Sande: We object to this as being outside the scope of the direct examination. Therefore it is incompetent, irrelevant, and immaterial.

"The Court: The court overruled the objection on the basis that he may be asked about his conversations with the defendant at any stage of the journey which you previously brought out in the examination.

"By Mr. Moses: Q. Did you make that statement at that time, Mr. Bungard? A. Well, I did not mean it the way it sounded.

"Q. Did Mrs. Robuck say at that time she did not want to take you up? A. Yes, sir, she did.

"Q. Then did you and Mrs. Robuck forget about it? A. Well, we did for a little while and then—I do not know whether —the subject got up to us again.

"Q. When? A. While on the way to the Elmo Club.

"Q. Then she agreed to go along with you? A. Yes, after I asked her two or three times."

It seems clear to us that defendant was not unduly restricted in the cross-examination of Bungard. Defendant's counsel contends that he was not permitted to examine Bungard concerning what he had testified to in the morning session, but we think the record shows that the right to so examine was preserved to defendant and actually exercised.

It is true that the court first stated that the witness may not be examined "with reference to testimony that has been stricken from the record." But later the court ruled that he "may be asked about his conversation with the defendant at any stage

of the journey which you previously brought out in the examination.'' Defendant was then permitted to show that what the witness first stated about considering the matter as a joke was correct as the first reaction of the defendant towards Bungard's proposal but that later, after the witness asked defendant two or three times, she then decided to go along with him in the robbery. There is no merit in defendant's contention that she was unduly restricted in the cross-examination of Bungard.

The second contention of defendant is that her written confession should not have been received in evidence. She contends it was not voluntarily made. The circumstances under which it was given are briefly the following: The police officers arrested defendant and Bungard together at Laurel. They were brought to Billings for questioning. Bungard made a written confession but said that before doing so he asked the officers if it would help defendant if he did so and was told by them ''that it probably would.'' And he testified: ''I signed it because I wanted it to go easier for her.''

The officer who brought defendant from Laurel, where the arrest was made, to Billings testified that he informed her that she had a right to counsel and that anything she said would be used against her and that she had the right not to make any statement at all.

Defendant would not make a statement to him but told him she wanted to see Bungard after she learned that he had made a statement. She was then taken to another police officer for questioning and she likewise would make no statement to him at first. The officer thereupon talked to Bungard out of the presence of defendant and asked him if he would tell defendant that he had made the statement and he said he would do so. He was then taken to the room where defendant was and was asked: ''Q. What did you say to her if anything concerning this confession? A. Well, I told her just to sign it. I said to go ahead and confess to the man, that it would probably go a little easier on her if she did.''

The test applied in determining whether a confession is vol-

■ untary and hence admissible is, "Was the inducement held out to the accused such as that there is any fair risk of a false confession?" State v. Sherman, 35 Mont. 512, 90 Pac.. 981, 119 Am. St. Rep. 869; State v. Dixson, 80 Mont. 181, 260 Pac. 138, 144; State v. Rossell, 113 Mont. 457, 127 Pac. (2d) 379.

In the Dixson case the sheriff stated: " 'I told him if he would come clean chances are it would be easier with him; didn't tell him it would, though.' " Another officer said: " 'I did tell him if a person told the truth, as a rule, he got out of it a whole lot easier than he would by telling a lot of lies.' "

The court held that the trial court did not err in admitting ■ the confessions. We see no substantial difference between that case and this one. The court did not err in holding that there was no such inducement as might result in a false confession.

Defendant points out that the confession "was procured in ■ the absence of counsel." This fact, however, does not affect the admissibility of the confession if it was otherwise voluntarily given. 20 Am. Jur., Evidence, sec. 503, p. 434.

The evidence was in conflict as to whether defendant was ■ advised of her right to counsel. If that circumstance has any weight in affecting the admissibility of the confession we would be forced to conclude that the district court in passing upon the admissibility of the confession resolved the fact situations against defendant where there was a conflict in the evidence. Compare: State v. Sherman, 35 Mont. 512, 90 Pac. 981; State v. Kacar, 74 Mont. 268, 240 Pac. 365; State v. Rossell, 113 Mont. 457, 127 Pac. (2d) 379; and People v. Cuellar, Cal. App., 242 Pac. (2d) 694.

The same is true on the issue as to whether defendant was advised that she need not make a statement. That issue too on conflicting evidence was decided against the defendant by the court in passing upon the admissibility of the confession.

Complaint is made too that the officer who brought defendant ■ from Laurel to Billings made false statements to her regarding her family. But this fact, if it be true, would not render

the confession later obtained inadmissible. 22 C. J. S., Criminal Law, sec. 827, p. 1450, and compare State v. Rossell, supra.

Defendant contends that she had taken sleeping pills that affected her mental condition at the time the confession was obtained and in consequence that the confession was inadmissible. The evidence is conflicting as to whether defendant had taken sleeping pills as she said she had. Exhibits 9 to 14 were notes written by defendant to Bungard and which were intercepted. In one of these defendant states: ''I didn't make out so good with the sleeping pills they caught me too soon.''

The notes also disclose on their face an attempt to formulate a story that would operate as a defense. In one of them it is stated: ''We both may have to go back on our statements.'' It seems clear to us that the court did not err in finding in effect that defendant knew what the statement contained and that she was not so affected mentally by sleeping pills as not to fully understand what she was doing when she signed the statement.

Finding no reversible error in the record, the judgment is affirmed.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES METCALF, FREEBOURN and BOTTOMLY, concur.