STATE OF MONTANA, Plaintiff and Respondent, v. LARRY LaVERNE NELSON, Defendant and Appellant.

No. 10133.

Submitted March 7, 1961. Decided May 19, 1961.

362 P.2d 224.

Arnold H. Olsen, Leif Erickson, Jerrold R. Richards, Helena, for appellant. Jerrold R. Richards, Helena, argued orally.

Forrest H. Anderson, Atty. Gen., Alfred B. Coate, Asst. Atty. Gen., Gene B. Daly, County Atty., Paul Hatfield, Deputy County Atty., Great Falls, for respondent. Gene B. Daly, Great Falls, and Alfred B. Coate, Helena, argued orally.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

The defendant was convicted of first degree murder and was sentenced to life imprisonment. He appeals from the judgment of conviction and in his specifications of error raises the following questions:

1. Did the district court err in refusing the defendant's motion to strike certain testimony?

2. Were the defendant's admissions and confessions properly admitted into evidence?

The defendant, Larry LaVerne Nelson, nineteen years of age, left his home in Great Falls, Montana, to seek employment in another area and located a job as a gas station attendant in Monte Vista, Colorado. While employed there he became acquainted with Steven Horn, who was seventeen years of age. The defendant worked in Monte Vista for three weeks and then decided to return in his car to Great Falls. Horn

decided to accompany the defendant on this trip and they were joined by two other youths, Butch Vares and David Van Ausdale. A .38 calibre revolver owned by Horn was taken on the trip.

After the four had reached Cheyenne, Wyoming, Vares and Van Ausdale decided to return to Monte Vista and the defendant and Horn continued the trip by themselves. On the evening of October 19, 1958, they stopped in Lewistown, Montana, to eat and then continued on toward Great Falls. They drove down a country road in search of deer, after having seen two go across the highway. After locating a doe Horn fired the revolver, but missed the doe. Shortly thereafter the defendant became dissatisfied with the driving of Horn and an argument ensued. The defendant grabbed the steering wheel and the car was brought to a stop about four miles from Great Falls. While the two were wrestling for control of the car the defendant felt the revolver underneath his leg. He picked up the revolver and was threatening Horn with it when it discharged and struck Horn. The defendant then placed Horn in the back seat of the car, after which he shot Horn a second time, drove through Great Falls to a spot on the River Road, and rolled Horn's body down a bank.

The body was discovered by deer hunters on October 21, 1958, but no identification was made. On November 7, Horn's father contacted the sheriff of Cascade County to obtain information concerning his son's whereabouts. Since the defendant had been with Horn when Horn was last seen the defendant was sought, located, brought in for questioning, and later arrested for the homicide of Horn.

The first specification of error involves the question of whether the court erred in refusing the defendant's motion to strike an answer given by the prosecution's witness David Van Ausdale during his testimony.

In considering this alleged error the testimony leading up

to the last answer of Van Ausdale and the defendant's motion to strike should be examined.

On direct examination of Van Ausdale by counsel for the prosecution concerning the defendant's actions with the homicide weapon in Colorado there were the following questions and answers, which were not objected to by defense counsel:

"Q. What did you do there? A. We ordered some root beers; this girl that worked there I asked if I could take her home, she said I'd have to call her mother, or she would, Larry [the defendant] pointed a pistol at her and told her to get in the car.

"Q. What pistol? A. A .38 of Steve's [the deceased]; I'd seen it in the car when we were talking.

"Q. When was that? A. He was talking about bears, I made a statement he was dumb to be talking like that, whatever he'd said, he leaned over the back seat with the gun and said 'this makes me bigger than you'. * * *

"Q. The first time he pointed it at you did you know if the gun was loaded? A. No I didn't.

"Q. He pointed it at you first? A. Yes.

"Q. What did he say? A. He said 'this makes me bigger than you'.

"Q. Who was there at that time? A. Me, Steve Horn, Larry Nelson, Butch Vares.

"Q. Then what happened? A. We were getting these root beers, this girl that works there come up to the car and made the delivery. I asked if I could take her home, she said she had to call her mother, Larry stuck the pistol out the window and said 'get in the car'.

"Q. What did she do? A. Jumped back and said 'point it some place else'.

"Q. Then what did he do? A. He laughed about it.

"Q. Was the gun loaded at that time? A. I don't know. * * *

"Q. What else happened at the drive-in that you know

about? A. Butch and Steve went in to get the pizza pies and cokes, Larry was playing with the pistol, the girls were hollering at him, he kept playing with it, turned the cylinder and pointed it over the seat, they was screaming.

"Q. What did he do then? A. He would laugh about it, then Steve and Butch came back in the car, he laid the pistol up on the back seat.

"Q. Did he do anything with it? He took the shells.    .

"Q. Were there shells in it? A. There were shells in it.
* * * ·

"Q. Did anything happen on that stretch? A. We was outside of Colorado Springs and seen some lights come behind us awful fast.

"Q. How fast were you going when those lights came up? A. He was doing about 80 or 85; Larry asked me to turn around and see if the lights were coming up on us fast. I couldn't tell if they was or not, he said he thought it was a highway patrolman, then he tromped on the foot feed.

"Q. What happened besides that? A. The pistol was laying on the seat, then he said 'he won't stop me'. * * *

"Q. Now you say the gun was in the front seat? A. In Walsenberg we stopped, Steve started looking for the pistol I had put under the back seat, Steve was hoping he didn't lose it some place on the way and looked for it, so I got it from under the seat and gave it to them.

"Q. To whom? A. I put it in the front seat.

"Q. Who took it? A. Larry Nelson.

"Q. What did he do with it? A. He loaded it.

"Q. What happened then? A. We all went into the cafe. * * *

"Q. When he thought it was a highway patrolman where was it? A. Between him and me.

"Q. What did he say? A. 'He won't stop me.' "
On cross-examination of Van Ausdale by defense counsel

there were the following questions and answers concerning the defendant's actions with the homicide weapon:

"Q. You don't know whether there were shells in the gun or not at the time you related that Larry pointed it at yourself and some girl? A. No, I don't.

"Q. Do you recall the exact words Larry Nelson used when he spoke to this girl about whom you relate and pointing the gun? A. He said 'get in the car'.

"Q. Do you remember how he said it, if in a regular tone of voice or in an assumed kind of voice? A. I would say it was his regular tone.

"Q. You didn't interpret this as some kind of play or joke? A. It might have been.

"Q. You think it might have been? A. It might have been.

"Q. Was there some smile or laughter about it at that time? A. Laughter afterwards.

"Q. Right following it? A. Yes.

"Q. You do not know if the gun was loaded at that time do you? A. No, I don't."

The following was on re-direct examination of Van Ausdale by counsel for the prosecution:

"Q. Did Larry say how he was going to get back to Monte Vista? A. He was going to hitch-hike.

"Q. When did he say that? A. That was in Monte Vista, Friday, the day we left.

"Q. Where was it at? A. We was going out to my place to get the suitcases.

"Q. In the car? A. Yes.

"Q. Who was in it? A. Larry Nelson, myself, Steven Horn, and Butch Vares.

"Q. Will you relate the conversation? A. I asked Larry how he was going to get back, he said he was going to hitch-hike, I told him he would have a rough time because

I did once from Georgia; he said 'this pistol will get me the kind of ride I want'.

"Mr. Olsen: I move the answer be stricken, it is too remote in time and place and has no relevancy in this case.

"The Court: Overruled, it may stand.

"Mr. Olsen: It is improper re-direct.

"The Court: Overruled, it may stand."

The defendant's motion to strike the answer of Van Ausdale raised the question of remoteness in time and place of the incident.

This court in State v. Satterfield, 114 Mont. 122, 127, 132 P.2d 372, 373, 374, stated:

"The objection that evidence is too remote is directed to the discretion of the court and is a matter that goes to the credibility of the evidence rather than to its admissibility * * * unless the remoteness is so great that the proffered evidence has no evidentiary value."

In 22 C.J.S. Criminal Law § 638, p. 977, it is stated: "Whether evidence is inadmissible because of remoteness rests largely in the sound discretion of the trial court, the objection going to the weight of the evidence, rather than to admissibility. In this connection, remoteness has regard to factors other than mere lapse of time, and is to be determined by the circumstances of the case."

Wharton's Criminal Evidence (12th ed.), § 149, p. 291, states: "There is no fixed standard for determining remoteness. It is therefore necessary to consider all the circumstances of the case, the nature of the act indicated or shown by the evidence offered, and the nature of the crime. In any case, the determination of whether evidence is too remote to be relevant is left to the discretion of the trial judge, and his decision will not be reversed in the absence of clear proof of an abuse of that discretion."

We find no error in the court's ruling in regard to alleged remoteness.

The defendant's motion to strike the answer of Van Ausdale also raised the question of relevancy of the incident.

In 22 C.J.S. Criminal Law § 611, p. 931, the rule is stated: "Evidence is relevant to show that accused owned, possessed, or had access to, tools, implements, or any articles with which the particular crime was * * * committed, and that he owned or had in his possession weapons with which the crime was * * * committed prior to * * * the commission of the crime." State v. Francis, 330 Mo. 1205, 1210, 52 S.W.2d 552, 554; State v. Nichols, 179 Minn. 301, 302, 303, 229 N.W. 99.

In Quinn v. State, 55 Okl.Cr. 116, 126, 25 P.2d 711, 715, the court stated: "Upon a trial for murder, where it appears the injuries were inflicted by a certain kind of instrument or weapon, evidence that defendant had such a weapon in his possession before the murder is admissible."

In Morton v. United States, 87 U.S.App. D.C. 135, 183 F.2d 844, 845, the court adopted the following rules: "As indicating the likelihood of a person doing * * * an act in question * * * his possession of the appropriate means or tools, are usually of sufficient probative value to be admissible." Wigmore on Evidence (3rd ed.), § 83, p. 512. "The previous possession * * * of special means, tools, apparatus, and the like, may be of probative value to show the doing * * * of an act requiring such means." Id., § 88, p. 516.

The court in Stapp v. State, 140 Tex.Cr. 669, 673, 147 S.W.2d 256, 258, an appeal from a conviction for murder with malice, held that the statements and conduct of the defendant in exhibiting a pistol, announcing he was "a tough guy", offering to do some fancy shooting with such pistol, and announcing that he wanted no one to give him "any static", occurring some time prior to the shooting of the deceased, were

admissible to show the defendant's motive and malice, and general and reckless disregard of the rights of others.

We find no error in the court's ruling in regard to alleged irrelevancy.

The second specification of error raises questions as to whether the defendant's admissions and confessions were properly admitted into evidence and whether the defendant was availed of his constitutional rights.

The defendant states that he was arrested without a warrant. However, section 94-6003, R.C.M. 1947, states: ''A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person —

\* \* \* \* \* \* \* \*

''2. When a person arrested has committed a felony, although not in his presence;

''3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it; \* \* \*''

The defendant was requested to go to the sheriff's office for questioning and was not arrested until after his confession was given. The arrest without a warrant subsequent to the confession was a proper one within the statute.

The defendant cites section 94-6016, R.C.M. 1947: ''When an arrest is made without a warrant by a peace officer or private person, the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and a complaint, stating the charge against the person, must be made before such magistrate.''

The purpose of this statute is to insure that the person arrested is advised of the charge made against him in order to enable him to prepare a defense, and to protect him from being held incommunicado for protracted periods of time.

The court in State v. Pierce, 4 N.J. 252, 263, 265, 72 A.2d 305, 311, 312, an appeal from a first degree murder convic-

tion, stated: "It is urged that the failure to take Pierce before the nearest available magistrate without unnecessary delay constitutes part of a 'complex of circumstances' showing the subsequent statement was coerced and involuntary. We think the surrounding circumstances already discussed in this opinion demonstrate the lack of merit in this contention. But assuming an unnecessary delay, we find no justification for the rejection of a statement otherwise voluntarily and freely made as here evidenced."

Taking cognizance of the statute providing for a hearing before a magistrate without unnecessary delay after the arrest of an accused, the Supreme Court of New Jersey said: "A confession is not rendered inadmissible solely by reason of a delay in taking the arrested person before a magistrate but that circumstance becomes an important factor to be given serious consideration in determining whether or not the confession was voluntarily made. The mere failure to follow the procedural rule, however, does not of itself destroy the voluntariness of the confession if the abuses the rule seeks to prevent did not in fact take place." 19 A.L.R.2d 1331, Admissibility of confession as affected by delay in arraignment of prisoner; 1 L.Ed.2d 1747.

The defendant was contacted at about 8:55 p.m., Friday, November 7, 1958, at his place of employment and was requested to come voluntarily to the jail for questioning. The sheriff arrived at about 10:00 p. m. and questioned the defendant. Shortly thereafter the defendant made an oral statement and then wrote and signed a confession which was witnessed by the sheriff and one of his deputies at 11:50 p. m. The defendant was booked at 12:07 a. m., Saturday, November 8. At 10:40 a. m. on Saturday a statement in the form of questions and answers was taken from the defendant by a stenographer in the county attorney's office in the presence of the sheriff and deputy county attorney. At 11:45 a. m. the same

day, Saturday, November 8, the appellant was brought before the magistrate in the courthouse.

In Cline v. Tait, 113 Mont. 475, 484, 129 P.2d 89, 93, where an arrest was made in the nighttime without a warrant, the court, in considering whether there was unnecessary delay in taking the arrested person before a magistrate, stated: "However, it cannot be said unreasonable as a matter of law to wait until ordinary office hours (see discussion and citations, 25 C.J. 493, § 62)." See section 25-306, R.C.M. 1947, fixing the hours for certain justices of the peace.

In Rounds v. Bucher, 137 Mont. 39, 349 P.2d 1026, 1028, where the plaintiff in a false imprisonment action had been picked up by the sheriff pursuant to a warrant of arrest at 4:00 p.m. on Saturday and had not been taken before a justice of the peace until 11:00 a.m. the following Monday, the court stated: "* * * we are not prepared to say, as a matter of law, that a delay from Saturday night until ordinary office hours Monday morning is an unnecessary delay."

The defendant states that he was not taken before a magistrate until after the confessions had been extracted. However, he does not show how this would constitute unnecessary delay, and we are unable to come to the conclusion that it did.

The defendant contends that the court erred in permitting the State to introduce the defendant's confessions without having laid a proper foundation, namely, by proving that the confessions were voluntary.

In State v. Robuck, 126 Mont. 302, 308, 309, 248 P.2d 817, 820, the court stated: "The test applied in determining whether a confession is voluntary and hence admissible is, 'Was the inducement held out to the accused such as that there is any fair risk of a false confession?'" State v. Sherman, 35 Mont. 512, 90 P. 981; State v. Walsh, 72 Mont. 110, 119, 232 P. 194, 197; State v. Dixson, 80 Mont. 181, 196, 260 P. 138, 144; State v. Rossell, 113 Mont. 457, 465, 127 P.2d 379, 382.

The confessions were not extracted by threat, promise or

inducement and the circumstances surrounding the confessions as to time, place and persons present were established. The trial court had sufficient information before it to determine whether a proper foundation was laid for the admission of the confessions. Upon that information the trial court properly admitted the confessions into evidence.

The defendant contends that one of the elements the state relied upon to prove the specific intent necessary in first degree murder was the language in the confessions relating to the second shot.

The defendant claims that some of the words in the confessions were suggested very forcefully by the sheriff, thus rendering the confessions involuntary and inadmissible.

On direct examination of the defendant by defense counsel there were the following questions and answers concerning the original questioning of the defendant by the sheriff:

"Q. Then what happened? A. I told him again how it happened, he says 'well didn't you shoot him again to shut him up, to stop him from making that noise', I told him no, he kept saying he wanted to know.

"Q. What did he want to know? A. When I shot him the second time; I told him I didn't know. He kept asking me, I said I might have, I didn't know when the second shot happened; he kept asking me and finally I said I might have, then he told me to write it up, then I wrote it up."

The defendant insists throughout the trial that he did not have any knowledge of a second shot and that the words in the written confession, "He started coughing and spitting blood, I rolled him into the back seat and shot him again", were demanded of him by the sheriff and that only after extensive insistence on the part of the sheriff did he give in and agree with the sheriff to that effect.

On direct examination of the sheriff by the county attorney

there was the following question and answer concerning the original questioning of the defendant by the sheriff:

"Q. Do you recall what he related to you orally? A. * * * he said 'I got in a scuffle with him, I don't know why I did it, I reached in the glove compartment and got the gun', he said it was loaded again, he had loaded it again after they left the scene of the deer shooting; he said then he shot the Horn boy; I said, 'where did you shoot him', he said 'I don't know, somewhere in the face'; I said 'what did you do then'; he said 'rolled him over the back seat in the car'; I said 'did you shoot him a second time', he said 'yes', I said 'why did you shoot him the second time', he said 'he was gargling and spitting blood, I had to shoot him again to keep him quiet.' "

The defendant claims that at the time he made his statement, which was transcribed in the county attorney's office on the morning of Saturday, November 8, the sheriff's presence so dominated him that he made statements which he otherwise would not have made, and also that at least one of his answers was induced by the leading form of the questions.

The transcribed questions of the deputy county attorney, Mr. Gabriel, and answers of the defendant are as follows:

"Q. What did you do? A. He started coughing and spitting blood; I rolled him into the back seat and I shot him again.

"Q. Did you put the gun up close to him? A. No sir, I didn't; I don't know how to explain it.

"Q. Just jerked off a shot? A. I guess that is the terminology."

On cross-examination of the defendant by the county attorney there were the following questions and answers concerning the defendant's transcribed statement:

"Q. Is there any particular reason that you did not relate anything that might be favorable to you to Mr. Gabriel? A. I told him at the time I thought it would be in

my favor to be consistent with what I told Leeper, and I thought it would be in my favor to be cooperative, I thought it would be in my favor if I answered questions that were asked me.

"Q. Without regard to the truth or veracity of the answers? A. In order to answer that question I have to give the same answer I did a little while ago, the second shot I don't know how it happened, I still don't know. * * *

"Q. Did you ever try telling Mr. Gabriel the truth and have him refute it? A. I was going to and Mr. Leeper was sitting right there so I thought to myself, I will be consistent, cooperate with them, do the best I can.

"Q. Did you feel you had an opportunity in the county attorney's office to tell the truth had you so desired? A. I am saying I was trying to cooperate, I answered the questions he gave me, then he asked me some not on the record, I did everything in my power to cooperate, no matter where it was, in the district attorney's office.

"Q. Do you feel if you had wanted to tell the truth in there you could have? A. I imagine I could have.

"Q. You say you feel you weren't given an opportunity in these other places, how about the county attorney's office? A. If Mr. Leeper had not been in there I would say I would have gone ahead and told him the same thing, I didn't know anything about the second shot, but having already agreed with Leeper, and he was sitting there, I told him the same thing.

"Q. Do I get it that you had an agreement with Sheriff Leeper about the second shot? * * * A. When I told Mr. Leeper I did not know anything about the second shot he kept asking for an answer, he suggested one, and I am saying that when he suggested it, that it could have happened a certain way, I agreed it might have happened that way, then I wrote it up."

From the previous testimony we do not find that the

questioning of the sheriff relating to the firing of the second shot was such that it suggested unfairly the answers of the defendant or amounted to coercion so as to render the confession involuntary and inadmissible.

Nor do we find that at the taking of the transcribed statement the sheriff's presence, which the defendant claims dominated him, was prejudicial to the defendant's rights.

Likewise we do not find that the leading form of the question of the deputy county attorney was prejudicial to the defendant's rights.

The defendant contends that the confessions were extracted from him by "third degree" methods. However, no more than three hours passed from the time the defendant was first contacted for questioning until he signed his written confession. And from the defendant's own testimony we find that he "was never abused in any manner".

Since the defendant was not questioned for an excessive length of time, nor was he otherwise mistreated, elements which would constitute "third degree" methods are lacking.

The defendant claims that the confessions and statements were taken from him at a time when he was denied the counsel of friends and family, particularly his mother, thus rendering them involuntary and inadmissible.

On direct examination of the defendant by defense counsel there were the following questions and answers concerning the defendant's requests to see his mother:

"Q. Then what, after Mr. Leeper got there? A. The first thing he did was give me his hand, said he was Sheriff Leeper, that he wanted to ask me a few questions; he started asking me questions, I heard my mother's voice out somewhere, I didn't know where it was, I asked if I could see mother at the time and my question was ignored.

"Q. Was there any other time before that you asked to see your mother? A. Just before Leeper came in.

"Q. What was the response to that? A. The question was ignored.

"Q. This was the second time it was ignored? A. Yes sir.

"Q. Then what happened? A. He kept questioning me on the same things, about where I worked in town, where in Colorado, where I stayed in Colorado, why I had gone to Colorado, then I asked for my mother again.

"Q. Did you answer all these questions? A. Yes I did.

"Q. Did they ask you about Steven Horn? A. Yes sir, they did.

"Q. You asked for your mother a third time? A. Yes sir.

"Q. What happened? A. Mr. Leeper said it was late, said there was no object in bothering my mother, it might worry her about what happened, that late at night.

"Q. Was there any particular reason you were asking for your mother? A. Yes sir, I wanted to talk to her before I told anybody else what happened."

On direct examination of the sheriff by the county attorney there were the following questions and answers concerning the defendant's requests to see his mother:

"Q. At that point did he mention anything else? A. * * * before he related the last part of the story to me he wanted to know if his mother was still at the jail, I got up, looked in the other part of the office and asked one of the boys if she was still there, they said no, she had gone home, I went back and said, 'no, your mother has left, Larry, do you want her for something', he said 'yes, if I am going to tell the truth about this I'd like to tell my mother first'; I said 'Son, why do you feel you have to burden your mother with this, I think when you are the one who has no doubt committed it why not take the load on your own shoulders, get it off your chest without bothering your mother, your mother has other children at

home'; he said 'all right,' then he said 'do you want me to tell it verbally or how'; I said 'if you care to relate the story to me, you can'; he told the story to me, after he related it I said 'Larry, I'd like to have you sign a statement to that effect; if you want to get an attorney before you write it that's all right'; he said 'I'd just as well, if you want to get some paper I will write it out for you', which he did.''

On cross-examination of the sheriff by defense counsel there were the following questions and answers concerning the defendant's requests to see his mother:

''Q. Do you know how many times the defendant asked for his mother? A. Just the one time to my knowledge, that is while I was there.

''Q. Only one time did he ask you? A. That is right. * * *

''Q. Who was there when he asked for his mother? A. Just the defendant and myself at the time he asked me.

''Q. On direct examination you said you went outside and inquired? A. I said I opened the door of my office into the other office and asked them if Mrs. Nelson was there.

''Q. Who did you ask? A. Possibly the jailer, or some of the boys in charge.

''Q. Do you know who that was? A. No, not necessarily I don't.

''Q. Are you sure the defendant didn't ask for his mother a second time? A. Not to me he didn't.

''Q. He only asked for his mother on one occasion while you were in the presence of the defendant? A. That is right.

''Q. You are sure of that? A. That's right, I am.''

Again on cross-examination of the sheriff by defense counsel there were the following questions and answers concerning the defendant's requests to see his mother:

"Q. What exactly was said about Nelson's mother in your conversation between you and Larry? A. This was before the defendant had gone too far in the matter, we were just about getting started when I asked him if he wanted to tell me the story or the way he wanted to relate it, or what he wanted to do; he said 'is my mother still out in the office', I said 'I don't know, I will see', so I stepped to the office door and asked if Mrs. Nelson was there, they said 'no, she went home', I told Larry 'I can get your mother back or send somebody after her but I can't see any reason to bother your mother with this thing as long as you can take the burden yourself, but if you want her somebody will get her'; he said 'I guess I will take it on myself.'

"Q. Did you tell him he should take it on himself? A. No I didn't, I told him as long as it happened I thought it would be better if he took it on himself instead of burdening his mother with it.

"Q. This was before he made the oral statement to you? A. He had practically admitted to me just ahead of that that he was the one implicated at the time.

"Q. This was at the time he was making an oral statement? A. Right.

"Q. Who did you ask about his mother? A. I asked the boys out in front, there were several around there, nobody in particular."

From the previous testimony we do not find that the defendant was denied the counsel of friends or family so as to render his confessions and statements involuntary and inadmissible.

Therefore, nothing alleged in the second specification of error constitutes error.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR and CASTLES concur.