**Gary H. RICHMOND, Appellant (Defendant below),**

v.

**STATE of Wyoming, Appellee (Plaintiff below).**
**No. 4544.**

Supreme Court of Wyoming.

Oct. 8, 1976.

1218

Gerald M. Gallivan, Director, Wyoming Defender Aid Program, Laramie, signed the brief and appeared in oral argument for appellant.

V. Frank Mendicino, Atty. Gen., Timothy J. Judson, Asst. Atty. Gen., and William Bormuth, Legal Intern, Cheyenne, signed the brief and Timothy J. Judson, Cheyenne, appeared in oral argument for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

In this appeal from a judgment and sentence following a jury verdict finding the defendant-appellant guilty of first-degree murder in killing a human being during an attempt to perpetrate a robbery in violation

of § 6–54, W.S.1957, as amended,[1] the defendant raises the following questions:

1. Could the defendant be prosecuted for the crime charged after the justice of the peace in the original preliminary hearing found no probable cause and dismissed the complaint?

2. Was a tape-recorded confession and the signed statement of the defendant admissible against him in the prosecution's case in chief over objection that they were not knowingly and voluntarily given and therefore not admissible under the Fifth Amendment and Rule 5 of the Wyoming Rules of Criminal Procedure?

3. Did the court err in refusing to instruct the jury on lesser included offenses, to-wit: manslaughter and assault and battery pursuant to defendant's written requests to charge?

4. Did the court err in refusing to instruct the jury that the defendant could be civilly committed after jury verdict of not guilty by reason of insanity, upon the defendant's written request to so charge, which request was renewed after the repeated suggestion in the prosecution's argument to the jury that the defendant would go free?

We will hold there was no error and affirm.

Briefly, the murder facts are that William Johnson, the operator of an automobile service station, was found shot to death by two different guns, causing three wounds, the one in his chest resulting in demise. Upon investigation, the defendant and another, Nathan Jones, were arrested on the date of the crime. The defendant was arrested at 4:00 p. m., and at about 5:00 p. m., he made a tape-recorded statement to the Carbon County undersheriff, in which he related the details of how he and Nathan Jones planned to and did rob the deceased, the defendant trying to tie him up with a T-shirt and an electric cord and Jones shooting the service station operator with both a .22 automatic and a .38 revolver.

Facts pertaining to the issues will be narrated as each question is considered.

Following the filing of a complaint in a justice of the peace court of Carbon County, located in Rawlins, the matter was set down for preliminary hearing before Justice of the Peace Young. At the preliminary hearing, that particular justice of the peace found that there was no probable cause and dismissed the complaint. The statement of the defendant was not used against him at that proceeding. The State filed a new complaint before another justice of the peace of Carbon County, located in Hanna. There, in addition to other evidence, the statement made by the defendant was used, probable cause was found and he was bound over to the district court.

The defendant relies upon a lone authority, *Jones v. State,* Okl.Cr.1971, 481 P.2d 169, wherein the court, as set out in its own syllabus, held:

"1. Dismissal at preliminary examination for lack of sufficient evidence to hold defendant for trial is a final and binding ruling and no subsequent refiling against the same defendant for the same offense shall be entertained unless the State makes an offer of additional evidence or proves other good cause to justify another preliminary examination. Additional evidence means that which

---

1. Section 6–54, W.S.1957, was amended by S.L.1973, Ch. 136, § 1, and as far as pertinent here is as follows:

"(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree.

\* \* \* \* \*

"(e) Upon conviction of murder in the first degree, if the offense does not involve a course of conduct as described in subsection (b) of this section, the person convicted shall be sentenced to imprisonment for life.

\* \* \* \* \* "

No course of conduct as described in subsection (b) is involved in this case, so the mandatory life sentence was imposed.

was not known to the State at the time of the first preliminary."[2]

That case stands almost as a judicial oddity, completely contrary to the vast majority. The same court has since softened in its position and now grants that when evidence is ruled insufficient, the same or another magistrate should not entertain a new filing for the same offense unless the State offers newly discovered evidence or shows other good cause to justify another examination and, in *Harper v. District Court of Oklahoma County,* Okl.Cr.1971, 484 P.2d 891, went on to say:

"It was not intended, nor is it expected, in order to show probable cause, that in all cases the prosecution must present its entire case before the examining magistrate. That is a decision to be reached by the district attorney, and in some cases such may happen; however, in the event the prosecutor miscalculates and fails to present sufficient evidence to show probable cause to bind over the accused, but possesses other witnesses whose testimony would strenthen his showing, it is clearly within the discretion of the examining magistrate to grant the state a continuance for that purpose. However, it is presumed that the additional witnesses, or other evidence, are reasonably available; and that a continuance will not be sought in order to conduct further investigation seeking that evidence, in a dilatory manner."

The purpose of the rulings, as explained in *Harper*, was to curtail "magistrate shopping." We do not visualize justice of the peace shopping in the case before us but rather a miscalculation of the amount of evidence necessary to satisfy the first jus-

tice of the peace. The statement of the defendant was available and could have been used at the first preliminary hearing. We have no inclination to on an ad hoc basis establish any such rules as those made by the Oklahoma court, particularly in a case of murder. No such rules currently appear in the Wyoming Rules of Criminal Procedure or the Minor Court Rules, adopted by this court.

■ With candor, the defendant admits that his research does not reveal any authority for the proposition that a second preliminary hearing violates the protection against double jeopardy but apparently thinks there ought to be. He decries the action of the first justice of the peace in dismissing and asserts that the defendant should have been bound over on a lesser charge of manslaughter, in that the evidence presented at the first preliminary hearing would support no more than that. We probably should not even discuss the first issue because there is a complete absence from the record of any transcript of proceedings before the first justice of the peace. The State, however, apparently acknowledges such to be the case and we consider that to be a stipulation of facts on appeal under Rule 75(d), W.R.C.P.

■ The rule has long been that one preliminary hearing, unproductive for the State, does not prohibit another. As set out in *United States ex rel. Rutz v. Levy,* 1925, 268 U.S. 390, 393, 45 S.Ct. 516, 517, 69 L.Ed. 1010, 1011:

"Under state law it has uniformly been held that the discharge of an accused person upon a preliminary examination for want of probable cause constitutes no bar to a subsequent preliminary exami-

2. The court's syllabus further set out the court's holding that:
"2. To refile a prosecution dismissed at preliminary, the State must return to the same magistrate, or in his absence, another magistrate, setting forth the prior dismissal and the additional evidence or other good cause to be offered.
"3. A magistrate's dismissal at preliminary examination for lack of sufficient

evidence to hold defendant for trial shall not be disturbed unless competent evidence additional to that offered at a prior preliminary provides a basis to hold the defendant for trial."
It would appear that the rule has created more problems than it stopped. See *Chase v. State,* Okl.Cr.1973, 517 P.2d 1142.

nation before another magistrate. Such an examination is not a trial in any sense and does not operate to put the defendant in jeopardy. * * *"

Since that 1925 decision, there has been no change in the law.[3]

Rule 7, W.R.Cr.P.,[4] is basically old Rule 5(b) and (c), F.R.Cr.P. In 1972, the federal rule was amended to add Rule 5.1, dealing exclusively with the preliminary examination. The following clause was added as Rule 5.1(b): " * * * The discharge of the defendant shall not preclude the government from instituting a subsequent prosecution for the same offense." As noted in 1 Wright Federal Practice &

Procedure: Criminal § 83, p. 36 (pocket-part), the new Rule 5.1, F.R.Cr.P., is for the most part only a clarification of old federal Rule 5(c).[5] Wyoming has not amended Rule 7, W.R.Cr.P., to incorporate Rule 5.1(b), F.R.Cr.P., but since the federal amendment was only clarification, it is not necessary.

It is well settled that double jeopardy does not attach in the case of a jury trial until a jury is empaneled and sworn. *Serfass v. United States,* 1975, 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L. Ed.2d 265, 274. This court has recently recognized, though the case did not require a holding, that the finding of no probable

---

3. A proceeding before an examining magistrate is not a judicial trial but merely a judicial inquiry and dismissal of a complaint is not an absolute bar to further prosecutions. *State v. Elling,* 1973, 19 Ariz.App. 317, 506 P.2d 1102; *Skinner v. Superior Court, In and for Pima County,* 1970, 106 Ariz. 287, 475 P.2d 271. Following are more of some of the recent cases holding that dismissal does not bar refiling before another magistrate: *Commonwealth v. Smith,* 1975, 232 Pa.Super. 546, 1975, 334 A.2d 741; *Perkins v. State,* 1975, 26 Md.App. 526, 339 A.2d 360; *State v. Thomas,* Mo.1975, 529 S.W.2d 379; *People v. Uhlemann,* 1973, 9 Cal.3d 662, 108 Cal.Rptr. 657, 511 P.2d 609; *State v. Fish,* 1963, 20 Wis.2d 431, 122 N.W.2d 381.

4. Rule 7, W.R.Cr.P., states as follows:
"(a) *Right to Preliminary Examination, Counsel and Bail.* In all cases triable in the district court, except upon indictment, the defendant shall be entitled to a preliminary examination. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules.
"(b) *Procedure.* The defendant shall not be called upon to plead at the preliminary examination. If the defendant waives preliminary examination, the commissioner shall forthwith hold him to answer in the district court. If the defendant does not waive examination, the commissioner shall hear the evidence within a reasonable time. The defendant may cross-examine witnesses against him and he may introduce evidence in his own behalf. If from the evidence it appears to the commissioner that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the commis-

sioner shall forthwith hold him to answer in the district court; otherwise the commissioner shall discharge him. The commissioner shall admit the defendant to bail as provided in these rules. After concluding the proceedings the commissioner shall transmit forthwith to the clerk of the district court all papers in the proceeding, including a transcript of docket entries, if any, and any bail taken by him."

5. Rule 5.1, Federal Rules of Criminal Procedure, Notes of Advisory Committee on Rules, 18 U.S.C.A., pp. 251–252:
"Subdivision (b) also deals with the legal effect of a discharge of a defendant at a preliminary examination. This issue is not dealt with explicitly in the old rule. Existing federal case law is limited. What cases there are seem to support the right of the government to issue a new complaint and start over. See e. g., *Collins v. Loisel,* 262 U.S. 426 [43 S.Ct. 618, 67 L.Ed. 1062] (1923); *Morse v. United States,* 267 U.S. 80 [45 S.Ct. 209, 69 L.Ed. 522] (1925). State law is similar. See *People v. Dillon,* 197 N.Y. 254, 90 N.E. 820 (1910); *Tell v. Wolke,* 21 Wis.2d 613, 124 N.W.2d 655 (1963). In the Tell case the Wisconsin court stated the common rationale for allowing the prosecutor to issue a new complaint and start over:
" 'The state has no appeal from errors of law committed by a magistrate upon preliminary examination and the discharge on a preliminary would operate as an unchallengeable acquittal. * * * The only way an error of law committed on the preliminary examination prejudicial to the state may be challenged or corrected is by a preliminary examination on a second complaint. (21 Wis.2d at 619–620 [124 N.W.2d 655].)' "

cause does not constitute an acquittal and there will be no bar to another proceeding before another justice of the peace or for a proceeding by indictment. *Thomas v. Justice Court of Washakie County,* Wyo. 1975, 538 P.2d 42, 48. We do now so hold. The State and the society it represents cannot be deprived of the right to an information for murder in the first degree on the frail and unfounded basis advanced by the defendant.[6]

■■■ After examination of the record, we have great difficulty understanding the defendant's position that it was not established by the State during the trial that a tape-recorded confession and a transcript of the recording, signed by the defendant, were knowingly and voluntarily given under the Fifth Amendment to the Constitution of the United States. Any holding we make in this regard will be made under a like provision of the Constitution of the State of Wyoming. Section 11, Article I, Wyoming Constitution, provides that: "No person shall be compelled to testify against himself in any criminal case, * * *."[7] We cite federal cases as authority for any principle we set out; we do so because of the identical purpose of the constitutional provisions, both state and federal. We realize that the Fifth Amendment is made applicable to states by the Fourteenth Amendment. *Malloy v. Hogan,* 1964, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659.

■ The State of Wyoming accords the same protection to its citizens and those within its jurisdiction and there is no reason why we should not apply Wyoming constitutional provisions in the administration of our jurisprudence, as long as they do not infringe upon the constitutional standards of the United States Constitution and deny the privilege against self-incrimination.[8] This court has never been blind to the fact that "protection of constitutional rights of an accused is not the peculiar province of the federal courts." *Dryden v. State,* Wyo.1975, 535 P.2d 483, 491. Nor are we blind to the rule that constitutional standards announced by the Supreme Court of the United States are minimal, which rights may be enlarged under State constitutional provisions if justifiable.

For purposes of this case, we recognize and accept *Miranda v. State of Arizona,* 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, 10 A.L.R.3d 974; *Escobedo v. State of Illinois,* 1964, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977; *Dryden v. State,* supra, all of which cases the defendant relies upon and were decided under the Fifth Amendment.

Following the defendant's arrest, he was taken to the sheriff's office where he was by the sheriff advised of his constitutional right to remain silent. All the defendant said at that time was that, "he had got together with Nathan [Jones] and they had went out to rob the Halfway Service Station but before they got there he had chickened out and he didn't know what happened from there on." The defendant was returned to a cell by the undersheriff.

---

6. For a monumental, exhaustive and interesting study, see 18 U.C.L.A.L.Rev. 636, "The Preliminary Hearing in Los Angeles: Some Field Findings and Legal-Policy Observations." We neither approve nor disapprove any conclusions of the authors, but it probably represents the most that has ever been said about the preliminary hearing, at any one time.

7. Amendment V to the United States Constitution provides, " * * * nor shall he [No person] be compelled in any criminal case to be a witness against himself, * * *."

8. Section 37, Article I, Wyoming Constitution, acknowledges that:
"The State of Wyoming is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land."

About five minutes later, the defendant asked to see the undersheriff saying, "I would like to talk to you again." After some further preliminary colloquy, defendant said, "I just want to talk to you and get this thing over with."

The undersheriff obtained a tape-recorder which was placed on a desk between the undersheriff and the defendant. The undersheriff testified, "I turned the recorder on. I recorded roughly what the case was about. I read to Mr. Richmond from the printed form a waiver of his rights." Defendant was handed the form from which the rights were read, for the defendant to read and sign.[9]

The United States Supreme Court in *Miranda v. State of Arizona,* supra, laid down the following rule:

"\* \* \* Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. \* \* \*"

That mandate was precisely followed. As the rights were read to him, the defendant was asked if he understood them, to which he answered in the affirmative.[10] The de-

---

9. The signed form is as follows:
"STATEMENT OF MIRANDA RIGHTS
 "1. You have the right to remain silent.
 "2. Anything you say can and will be used against you in a court of law.
 "3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
 "4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.
 "5. You can decide at any time to exercise these rights and not answer any questions or make any statements.
 "WAIVER OF RIGHTS
 "I have read the above statement of my rights and I understand each of those rights, and having these rights in mind I waive them and willingly make a statement.
 "Witnessed by: /s/ Gary H. Richmond
 "/s/ Floyd M. Rodabaugh
 "Officer's Name
 "Carbon Carbon [sic]
 "Date: July 30, 1974.
 "Time: 5:15 P.M."

10. The opening of the interrogation, as transcribed from the tape recording was as follows:
 "MR. RODABAUGH: This is an interview with Gary Richmond in reference to a murder case now being investigated by the Carbon County Sheriff's Office, the murder which occurred at the Halfway Service Station between Rawlins and Sinclair on old U.S. 30. Victim was William Johnson. Death apparently occurred during the commission of a robbery; suspect was apparently fatally shot with a .38 caliber pistol. Now, Gary, I want to advise you of your rights. Number one, you have the right to remain silent. You understand what I mean?
 "A Yes, I do.
 "Anything you say can and will be used against you in a court of law. Do you understand what that means?
 "Yes.
 "Q You have the right to talk to a lawyer and have him present with you while you are being questioned.
 "A Yes.
 "Q Now, is there any doubt about what that means?
 "A No, I understand what it means.
 "Q If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish. This would be at no expense to you if you cannot afford an attorney. The State would have to appoint one.
 "A I just want to get it over with.
 "Q You can decide at any time to exercise these rights and not answer any questions or make any statements.
 "A I understand that.
 "Q That means if you decide now you want to talk to me and in half a minute you decide you don't want to, you can stop.
 "A No, like I said, I just want to get it over with and get this thing together.
 "Q Okay. Now, down below here we have a waiver of these rights. It says, I have read the above statement and my rights, and I understand each of those rights and having those rights in mind, I waive them and willingly make a statement. Now, I want you to read the rights and the waiver and if you want to sign it and talk to me, you can do so after that.
 "(Pause)

fendant was coherent, appeared to be normal and aware of what he was doing during the tape-recorded interrogation which followed. The answers to questions are in detail, lucid and fit into other evidence respecting the offense. Both the tape recording and a transcription of the recording are in evidence. After the tape was transcribed, it was signed the next day by the defendant, under oath. A hearing on the voluntariness was held before the trial judge in the absence of the jury and also in the presence of the jury in accordance with accepted practice. *Lonquest v. State,* Wyo.1972, 495 P.2d 575, cert. den. 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299.

Following the hearing before the trial judge, the recording and document which did represent a confession of the defendant's involvement in the crime and was probably a strong part, if not the strength, of the State's case, was declared by the trial court to have been voluntarily made after a full *Miranda* warning and further that the defendant was not at the time intoxicated or under the influence of drugs. We can further add that there is no evidence that any pressure was applied by any law enforcement officers; no promises of any sort were made to the defendant. He was not held in confinement for an extended period before, at his own request, he made a full confession. Furthermore, the jury found him sane at the time of the commission of the offense, which took place on the morning of the day he confessed.

However, the defendant says that even if that is so, the undersheriff used a statement the defendant made to the sheriff to coerce him into his revelations, which statement he made before being warned of his full right to remain silent. The statement referred to is one we have already mentioned that "he had got together with

Nathan [Jones] and they had went out to rob the Halfway Service Station but before they got there he had chickened out and he didn't know what happened from there on." After this statement, the defendant was taken to a cell. The undersheriff testified in that regard as follows:

"A. When we headed up in the elevator I told him he was lying to us.

"Q. Did you tell him how you knew he was lying?

"A. I told him I had other evidence that showed he was lying to me.

"Q. Did you tell him what the other evidence was?

"A. I did not.

"Q. Did you tell him how much you knew at that time?

"A. I did not.

"Q. He had already put himself in the soup by admitting that he knew who had committed the crime?

"A. Yes, I would say he was already in the soup.

"Q. What evidence did you have that Mr. Richmond was involved?

"A. My evidence was that he was in the vicinity, had an orange shirt, and that he had already talked to Sheriff Ogburn and implicated Nathan Jones in the crime."

Defendant's theory is not completely true that the statement he made to the sheriff thus triggered his confession and he had broken his right to silence before an adequate warning. Even though a somewhat farfetched approach, it can be disposed of by a holding that he was fully warned before making the brief statement to the sheriff. When the sheriff first talked to the defendant before making the recorded statement, the "standard *Miranda* warning" was given to Richmond. The undersheriff could not recall it by memory but was per-

---

"Q You want to sign it, then, Gary? Will you speak up so they will hear you?
"A Yes, I will sign it.
"Q Okay.

"A Like I said, I just want to get this thing taken care of and get it out of the way."

mitted to read during his testimony exactly what was the standard warning given by the sheriff, identical to the warning later signed by the defendant appearing in footnote 9. *Miranda* has not prescribed a particular manner of proof that the warnings were given.

■ The defendant claims that this is violative of *Dryden*, supra. The facts of the instant case are nothing like there. In *Dryden*, no full statement of the defendant's rights under *Miranda* were given him before making any statement. In *Dryden*, the sheriff did not ask the defendant if he wanted an attorney and did not tell him of his right to stop the statement at any time and the sheriff would desist if this were suggested. In the case now before us, we know exactly what was said because the printed form read from is before us. On that form appears the specific fatal omissions of *Dryden*. The defendant here would have us discard the evidence that the sheriff read from the form. In *Dryden* there was no evidence of what specific *Miranda* rights were given the defendant; here, there is such evidence and it is explicitly in accord with *Miranda*.[11] We hold that the confession was constitutionally obtained.

The next point made by defendant is that the recorded and signed statement was not admissible because it was obtained in violation of Rule 5, W.R.Cr.P., in that the defendant was not taken before a justice of the peace until the day after his arrest. Rule 5 provides:

"(a) An officer making an arrest under warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner. When a person arrested without a warrant is brought

before a commissioner, a complaint shall be filed forthwith.

"(b) The commissioner shall inform the defendant of the complaint against him and of any affidavit filed therewith, of his right to retain counsel, of his right to request the assignment of counsel if he is unable to obtain counsel, and of his right to consult counsel and to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him."

It is the argument of defendant that there was unnecessary delay and therefore the statement of defendant is inadmissible under the rule of *McNabb v. United States,* 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, reh. den. 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727, and *Mallory v. United States,* 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. There are no Wyoming cases on the question.

The defendant was arrested at about 4:00 p.m. on July 30. The tape-recorded statement was given at 5:00 p.m. that same afternoon. The typed transcript of the statement was presented to the defendant and signed under oath by him at about 2:00 p.m. the next afternoon. At about 5:30 p.m. of the same afternoon, he was taken before a justice of the peace.

The *McNabb-Mallory* rule is basically Rule 5(a), F.R.Cr.P., (Rule 5(a), W.R.Cr. P.), requiring that an arrested person be taken without "unnecessary delay" before the nearest committing officer. *McNabb* was decided at about the time Federal Rule 5(a) was being considered for adoption. It held confessions inadmissible because of failure to take defendants promptly before a committing magistrate. In that case, the defendants had been

---

11. Not only did the sheriff fully deliver to the defendant a complete *Miranda* warning but he was likewise previously warned at the very moment of his arrest in a Rawlins city park by an Officer Glidden, who read them from a card, also received in evidence. Three times he was read his rights before making the confession, received in evidence. In his testimony in defense, defendant admitted receiving the city park warning.

placed in a barren cell for 14 hours. For two days they were subjected to unremitting questioning by numerous officers. That conduct "compelled" the defendants to incriminate themselves in violation of the Fifth Amendment. The Supreme Court made it clear that "[t]he mere fact that a confession was made while in custody of the police does not render it inadmissible." The court went on to say that its holding only "forbids that men should be convicted upon evidence secured under the circumstances revealed here." Plainly, the facts in the case before us do not compare to the circumstances of *McNabb*. No pressure was applied to Richmond and he volunteered the confession he made.

After Rule 5(a) was adopted, *Mallory* was decided. The defendant there, while a suspect, was first questioned for about half an hour. The police then asked him to submit to a detector test. He was not told of his rights to counsel or to a preliminary examination before a magistrate, *nor was he warned that he might keep silent or that any statement he made might be used against him*. After intensive questioning, he finally confessed at about 10:00 p.m. that night. He was taken before a commissioner the next morning. The court there explained that after arrest on probable cause, the next step is to take the arrested person before a judicial officer "as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined." The *Mallory* court made it clear that:

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession."

The court then said, "The circumstances of this case preclude a holding that arraignment was 'without unnecessary delay.' "

■ There again was a case entirely unlike the circumstances of this case. We must realize that before us now, we have a crime committed in the morning. The law enforcement officers were scrambling for evidence, interrogating witnesses, looking for suspects, communicating with the county attorney. Scant time was available to take even the barest of steps to initiate a prosecution against the defendant. In less than an hour after his arrest, he had volunteered a confession, without any meaningful preliminary interrogation. It would strain to a breaking point our sense of practicality to see any "unnecessary delay" involved in this case. Using only the bare rules of *McNabb* and *Mallory* and ignoring developments of the law subsequent to *Mallory*, the facts of this case are within any reasonable interpretation of those cases. Neither carry any implication whatsoever that an arrested person cannot be questioned at all between the time of his arrest and the appearance before a justice of the peace or magistrate. Some interrogation and a short delay between arrest and arraignment are presently permissible. *Gray v. United States,* 9 Cir. 1967, 394 F. 2d 96, cert. den. 393 U.S. 985, 89 S.Ct. 459, 21 L.Ed.2d 446; *Rogers v. United States,* 5 Cir. 1964, 330 F.2d 535, cert. den. 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186; *United States v. Vita,* 2 Cir. 1961, 294 F.2d 524, cert. den. 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788.

■ The case before us is more like *United States v. Mitchell,* 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, reh. den. 322 U.S. 770, 64 S.Ct. 1257, 88 L.Ed. 1595, decided shortly after *McNabb*. The court affirmed a conviction and explained in that case:

"* * * Inexcusable detention for the purpose of illegally extracting evidence from an accused, and the successful extraction of such inculpatory statements

by continuous questioning for many hours under psychological pressure, were the decisive features in the *McNabb* case which led us to the rule that a conviction on such evidence could not stand.

"* * * Therefore, in cases coming from the state courts in matters of this sort, we are concerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice. * * *"

In *Mitchell,* a still viable case, within a matter of minutes after his arrival at the police station, the defendant admitted guilt and authorized a search of his home. We cannot make a mechanistic comparison of the situation in the case we now consider and say one hour is not the minutes involved in *Mitchell.* The law is not so rigid that it can be measured in minutes by clock-watching but requires a comparison of principles. Mitchell was not detained for the purpose of illegally extracting evidence from him nor was Richmond. Such a threshold confession is admissible.

In *Walton v. United States,* 10 Cir. 1964, 334 F.2d 343, cert. den. 379 U.S. 991, 85 S. Ct. 706, 13 L.Ed.2d 612, a defendant, when confronted with stolen bank money, started to tell the story and there was a delay in taking him before a United States commissioner and filing a complaint in order to give him an opportunity to complete his voluntary statement. The court decided that under those circumstances investigat-

ing officers are not required to refuse to permit a detained or arrested person to continue the statement for the purpose of rushing him before a committing magistrate. As pointed out there, the delay to which the defendant objected had no influence whatsoever on what he told the officers. The court held that not to be an unnecessary delay.

 In *State v. Johnson,* 1949, 69 Ariz. 203, 211 P.2d 469, the defendant was not apprehended after the homicide until after 5:00 p.m., talked to the deputy sheriff in the court house between 5:40 p.m. and 6:00 p.m. and made a statement to officers and court reporter at 6:30 p.m. on the same day. Held, there was no unnecessary delay and defendant was not improperly taken before a court reporter for taking down his statement prior to his appearance before a magistrate.[12] There is no hard and fast rule as to what constitutes unnecessary delay and each case must stand on its facts. *Butterwood v. United States,* 10 Cir. 1966, 365 F.2d 380, cert. den. 386 U.S. 937, 87 S.Ct. 960, 17 L.Ed.2d 810.

 As observed by Wright in 1 Federal Practice & Procedure: Criminal §§ 72 through 76, in his discussion of *McNabb-Mallory,* what was for many years referred to as the most difficult problem in criminal procedure—the permissible scope of post-arrest investigation—has subsided because the controversy swirled around the fact or belief that advice given to him by a magistrate will make him less likely to re-

---

12. Unnecessary delay in bringing a defendant before a magistrate does not of itself make admissions or confessions inadmissible. *State v. Kitashiro,* 1964, 48 Haw. 204, 397 P.2d 558 (conviction reversed on other grounds); *State v. Freeman,* 1965, 195 Kan. 561, 408 P.2d 612, cert. den. 384 U.S. 1025, 86 S.Ct. 1981, 16 L.Ed.2d 1030 (confession obtained during prolonged detention is admissible if voluntarily made and not a product of the detention); *State v. Nelson,* 1961, 139 Mont. 180, 362 P.2d 224; *State v. Fouquette,* 1950, 67 Nev. 505, 221 P.2d 404, cert. den. 341 U.S. 932, 71 S.Ct. 799, 95 L.Ed. 1361, cert. den. 342 U.S. 928, 72 S.Ct. 369, 96 L.Ed. 691; *State v. Minor,* 1968, 78 N.M. 680, 437 P.2d 141; *State v. Hart,* 1964, 15 Utah 2d 395, 393 P.2d 487; *State v. Vangen,* 1967, 72 Wash.2d 548, 433 P.2d 691; *State v. Everett,* 1974, 110 Ariz. 429, 520 P.2d 301, cert. den. 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120; *United States v. Bear Killer,* 8 Cir. 1976, 534 F.2d 1253; *United States v. McCormick,* 10 Cir. 1972, 468 F.2d 68, cert. den. 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588. See annotation, "Admissibility of confession as affected by delay in arraignment of prisoner," 19 A.L.R.2d 1331, and Later Case Service for many more citations. The thread running throughout all of the above cases is that as long as the confession is not the fruit of detention, it is admissible.

spond to police interrogation and thus reduce the possibility of obtaining a confession from him and *Miranda* now requires that the same protections apply as soon as a person is deprived of his freedom in any significant way. Such advice and protections were given the defendant from the moment he was picked up. We do not mean to infer that *Miranda* overrules *McNabb-Mallory* or sets aside Rule 5 but it does supplement and soften the effect to one of less strictness.

The interrelation of *McNabb-Mallory-Miranda* is probably best explained in *Pettyjohn v. United States,* 1969, 136 U.S. App.D.C. 69, 419 F.2d 651, 656, cert. den. 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676:

"* * * What appellant has lost sight of and what needs illumination in this area of the law is the interplay between *Miranda* and *Mallory.* We find that appellant, by validly waiving his *Miranda* right to silence and an attorney, and by agreement to speak with the police, has thereby also waived any *Mallory* right to be brought before a magistrate 'as quickly as possible.' *Mallory, supra,* at 454, 77 S.Ct. 1356. Indeed, we had occasion recently to articulate this limitation that *Miranda* has effected upon the earlier *Mallory* decision. In short, we held that [a] valid *Miranda* waiver is necessarily * * * also a waiver of an immediate *judicial* warning of constitutional ·rights (footnote omitted.)"

*Pettyjohn* does not stand alone. In *United States v. Woods,* 9th Cir. 1972, 468 F.2d 1024, cert. den. 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 496, it was held that a confession given under a full *Miranda* warning operates as a waiver of Rule 5(a) and *Mallory.* See also *United States v. Lopez,* 9 Cir. 1971, 450 F.2d 169, ·cert. den. 405 U.S. 931, 92 S.Ct. 985, 30 L.Ed.2d 805, and *United States v. Halbert,* 9 ·Cir. 1970, 436 F.2d 1226.

Up to this point we have only concerned ourselves with the time lapse between arrest and the taking of the defendant's statement by tape recorder. That was completed in the afternoon but defendant was not taken before a justice of the peace until late the following afternoon. That delay was in part due to the necessity of transcribing the recording and obtaining the signature of the defendant about 2:00 p.m. of the following afternoon. His justice of the peace appearance did not then take place until 5:30 p.m.

■ The law is well settled in that regard. In *United States v. Curry,* 2 Cir. 1965, 358 F.2d 904, cert. den. 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100, reh. den. 387 U.S. 949, 87 S.Ct. 2079, 18 L.Ed.2d 1341, reh. den. 392 U.S. 917, 88 S.Ct. 2049, 20 L.Ed.2d 1378, it was held that even if a commissioner before whom arrested defendant could have been brought had been available, it was not incumbent upon the officers, under the circumstances, to interrupt the interrogation where a fruitful investigation was in progress and valuable momentum was not to be lost, and the delay in taking defendant before commissioner resulting from reducing the statement in writing and having defendant read and sign it was likewise not an unnecessary delay. In *LaShine v. United States,* 1967, 126 U.S. App.D.C. 71, 374 F.2d 285, it was held that if the oral admission was forthcoming without a violation of Rule 5(a), then the admission of the written statement does not compel reversal unless the latter itself was either involuntary or the fruit of an unnecessary delay within the time limitations of Rule 5(a). The trial judge's findings on voluntariness remain undisturbed; and it is not true that Rule 5(a) is automatically violated by the reduction to writing of an oral admission. See *United States v. Vita,* supra; *United States v. Ladson,* 2 Cir. 1961, 294 F.2d 535, cert. den. 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789; and *Bailey v. United States,* 1964, 117 U.S.App.D.C. 241, 328 F.2d 542, cert. den. 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741, to the same effect.·

As far as the time following reduction to writing of the oral statement is concerned, that time now becomes immaterial. As indicated in *United States v. Mitchell*, supra, the mere fact that a confession made while in custody of the police does not render it inadmissible where the accused confessed to guilt but was not taken before a committing magistrate until some eight days later. The court reasoned that admission of the statements would not be used as the fruits of wrongdoing by the government officers. The court indicated that,

"* * * Being relevant, they could be excluded only as a punitive measure against unrelated wrongdoing by the police. Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct."

 The burden is on the defendant to prove a violation of Rule 5(a). *Barnett v. United States,* 5 Cir. 1967, 384 F.2d 848, reh. den. 391 F.2d 931; *Joseph v. United States,* 5 Cir. 1957, 239 F.2d 524; *White v. United States,* 5 Cir. 1952, 200 F.2d 509, cert. den. 345 U.S. 999, 73 S.Ct. 1142, 97 L. Ed. 1405, reh. den. 346 U.S. 843, 74 S.Ct. 17, 98 L.Ed. 363. He has failed to do so. He has not shown that his confession was the product of his detention. We hold that there was no illegally conducted in-custody interrogation and extraction of a confession. The defendant was treated fairly in every respect. There was no overreaching by any law enforcement officer. We discard any concept that it is impossible for a person to waive his right to remain silent and voluntarily discuss an action which must have weighed heavily upon his mind and conscience. It is not so much that the defendant did not know what he was doing but now, in retrospect, he finds it was an unwise thing for him to do. We would be equally unwise to reverse upon his claim.

We arrive now at the claim of the defendant that the trial judge should have instructed the jury on what are asserted to be lesser included offenses of manslaughter and assault and battery. It is with some perplexity that we approach the deeply theoretical contention of the defendant, because of its failure to square with existing Wyoming and other accepted jurisprudence. While we are willing to replace worn-out law with better reasoned principles, the ideology of the defendant does not seem to come up to that hypothesis.

 In the case now before us, the defendant was charged with first degree felony-murder and the felony alleged was attempted robbery. The trial judge meticulously instructed the jury that one of the essential elements of an attempt to commit robbery is a specific intent to forcibly take from the person or possession of another any property of value. Section 6–54, W. S.1957, as amended, the statute creating the crime of felony-murder, which is set out in footnote 1, is in several alternatives,[13] of which our concern is only one: "Whoever * * * in the perpetration of, or attempt to perpetrate any * * * robbery * * * kills any human being, is guilty of murder in the first degree." Put in other terms: if someone gets killed by one in the course of attempting a robbery, the robber is guilty of first degree murder.

As we understand the notion of the defendant's defense, his intoxication or being under the influence of drugs created a reasonable doubt that he was capable of formulating the specific intent to commit robbery and therefore he could not properly be found guilty of first degree murder. The trial judge instructed the jury in these

---

13. Under this section there are three sets of circumstances under which a person may properly be convicted of the crime of murder in the first degree: First, if he commits the act purposely and with premeditated malice; second, if he commits the act in the perpetration of certain specified other crimes; and, third, if he commits the act in the attempt to perpetrate these specified crimes. *State v. Lindsay,* 1957, 77 Wyo. 410, 317 P.2d 506.

aspects and informed them that intoxication[14] or being under the influence of drugs[15] is to be considered in determining whether or not the defendant acted with a specific intent. The defendant then asserts that since he was entitled to have the jury consider his theory of defense that since he was incapable of intending to rob the now dead victim, he was also entitled to have jury consideration of what he claims to be the lesser included offenses of manslaughter and assault and battery, in each of which specific intent is not a necessary element.

Rule 32(c), W.R.Cr.P., a counterpart of Rule 31(c), F.R.Cr.P., is as follows:

"The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."

Our question has now boiled down to whether manslaughter and assault are necessarily included in the offense of felony-murder.

The crime of manslaughter is defined by § 6-58, W.S.1957:

"Whoever unlawfully kills any human being without malice, expressed or implied, either voluntarily, upon a sudden heat of passion, or involuntarily, but in the commission of some unlawful act, or by any culpable neglect or criminal carelessness, is guilty of manslaughter, and shall be imprisoned in the penitentiary not more than twenty years."

The defendant offered the following refused instruction with respect to manslaughter:

"Manslaughter may be committed whenever a person kills any human being during the commission of an unlawful act, such as an assault and battery."

Section 6-68, W.S.1957, defines the crime of assault and battery:

"Whoever, in a rude, insolent or angry manner, unlawfully touches another, is guilty of an assault and battery, and shall be fined not more than one hundred dollars, to which may be added imprisonment in the county jail not exceeding six months."

The defendant offered the following refused instruction with respect to an assault:

"Assault and battery is committed when a person, in a rude, insolent or angry manner, unlawfully touches another.

"Assault and battery does not require a specific intent. It requires only the will-

---

14. Instruction No. 14 is as follows:
"Although intoxication or drunkenness alone will never provide a legal excuse for the commission of a crime, the fact that a person may have been intoxicated at the time of the commission of a crime may negate the existence of a specific intent.
"So, evidence that a defendant acted or failed to act while in a state of intoxication is to be considered in determining whether or not the defendant acted with specific intent as charged.
"If the evidence in the case leaves the jury with a reasonable doubt whether, because of the degree of his intoxication, the mind of the accused was capable of forming, or did form, specific intent to commit the crime charged, the jury should acquit the accused."

15. Instruction No. 15 is as follows:
"The Court instructs the jury that although defendant may have been under the influence of some drug, even a drug taken for medical purposes, at the time of the alleged offense, [it] is not a defense to the crime charged, the fact that a person may have been under the influence of a drug at the time of the commission of a crime may negative the existence of specific intent.
"So, evidence that defendant acted while under the influence of some drug is to be considered in determining whether or not the defendant acted with specific intent as charged.
"If the evidence in the case leaves the jury with a reasonable doubt whether, because of the degree of his drug-use, the mind of the accused was capable of forming, or did form, specific intent to commit the crime charged, the jury should acquit the accused."

ful and voluntary touching of another in a rude, insolent or angry manner."

In *Keeble v. United States,* 1973, 412 U. S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844, 847, it was held, in interpreting Rule 31(c), F.R.Cr.P.: "[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Oldham v. State,* Wyo.1975, 534 P.2d 107, cites and recognizes the *Keeble* doctrine but also declares:

"* * * The rule in this state is clear that the trial court should only give such instructions as arise from the evidence and that when the evidence shows that the defendant is either guilty or not guilty of the higher grade of the offense, the court is not required to instruct on the lesser offense. [Citing cases.] * * *"

Is the situation such in the case before us that there is just evidence that would sustain only a guilty or not guilty verdict for felony-murder?

▮▮▮ This court has not previously dealt with this particular offense in the light of the appropriateness of instructing on any lesser included offenses. Felony-murder is an unusual offense in that the death arising out of the robbery is purely an incident of the basic offense. It makes no difference whether or not there was an intent to kill. The statutory law implies all of the malevolence found and necessary in the crime of first-degree murder alone. Perhaps we can convey a better understanding of that concept if we explain the purpose of the prohibition against felony-murder and the reason it is automatically first-degree murder with its accompanying heavy penalty, usually the greatest society

can impose upon a violator, though in Wyoming only life imprisonment is mandatory. We find an excellent summary of the function in society of the felony-murder crime in a reference the defendant has cited, "The Diminished Capacity Defense to Felony-Murder," 23 Stan.L.Rev. 799: [16]

"The purpose of the felony-murder rule, according to the California supreme court, is 'to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit.' The rule relates the initial intent to commit a felony to the resultant homicide, based on the following rationale: All persons are presumed sane and competent and are presumed to know and intend the natural consequences of their acts; such persons, contemplating the commission of one of the enumerated felonies, are also presumed to recognize and reflect upon the high degree of risk of causing death involved in that act. Therefore, the requisite malice for murder is implied from the commission or attempted commission of the enumerated felony, and premeditation and deliberation are established by the presumed consideration of the risks involved. A killing committed in a felon's perpetration of one of the enumerated felonies is thus considered first degree murder."

▮▮▮ Since the necessary elements of first degree murder—premeditation, deliberation and malice aforethought—are imputed by a conclusive presumption, there can be no lesser degrees of homicide recognized. Murder committed in the perpetration of a robbery is not divisible into lesser degrees of homicide. There is no room for the exercise of a power to find the defendant guilty of a lesser degree of felonious homicide depending upon the existence or non-existence of intent. In our search we find that to be the general rule.

16. We use this article for no other purpose. We have verified the footnote references in the quoted portion and with our other study find the expressions set out are those generally accepted in other jurisdictions; they ap-

pear reasonable. The article acknowledged that what it proposes is not presently the law of California; we do not adopt its suggestion.

(Any necessary intent must be associated with attempted robbery but not the homicide.) *Proll v. Morris,* 1975, 85 Wash.2d 274, 534 P.2d 569; *State v. Kruchten,* 1966, 101 Ariz. 186, 417 P.2d 510, cert. den. 385 U.S. 1043, 87 S.Ct. 784, 17 L. Ed.2d 687; *People v. Imbler,* 1962, 57 Cal. 2d 711, 21 Cal.Rptr. 568, 371 P.2d 304; *State v. Braasch,* 1951, 119 Utah 450, 229 P.2d 289; *State v. Bradley,* 1950, 361 Mo. 280, 234 S.W.2d 556; *State v. Reed,* 1934, 39 N.M. 44, 39 P.2d 1005, 102 A.L.R. 995; *State v. James,* 1921, 96 N.J.L. 132, 114 A. 553, 16 A.L.R. 1141; *People v. Schleiman,* 1910, 197 N.Y. 383, 90 N.E. 950. While old, we can find no change in the law expressed in annotations on the subject found in 102 A.L.R. 1019, 27 A.L.R. 1097 and 21 A.L.R. 603.[17] We therefore hold that manslaughter is not an offense necessarily included in robbery and therefore not included in the crime of felony-murder here charged.

▮▮▮ The subject must be discussed a bit further because of defendant's assertion that assault and battery is an included offense upon which the jury should have been instructed. Keep in mind that the evidence here was that the fatal shots were fired by Nathan Jones and not the defendant but the robbery was the act of both. As an aider and abettor, the defendant was chargeable as a principal. Section 6–14, W.S.1957. The jury was appropriately instructed in that regard and defendant raises no question that the defendant was not an accomplice of Nathan Jones. There is no doubt whatsoever that death of the victim ensued during the course of the robbery. It would be a travesty on justice to allow a jury to even consider a minor offense of assault and battery. The homicide cannot be disassociated from the attempted robbery. If the defendant was incapable of entertaining an intent to commit the robbery, then he should have been acquitted. That is the only area in which intent is an issue. Intent is not an element in the homicide that was connected to the robbery. We can see no reason for submitting the issue of any lesser offense when the evidence conclusively shows the defendant guilty of the highest degree of homicide. While the jury might, if that question were submitted to them, return some verdict of a lesser crime, this does not require the court to invite them to do so by submitting to them a theory of the case not rationally supported by the evidence.

The evidence is such that the jury could not have acquitted the defendant of murder unless it found him to be incapable of forming an intent to rob or insane at the time of the offense, both of which questions were submitted to the jury.[18]

---

17. Contra, the defendant cited us to *Government of Virgin Islands v. Carmona,* 3 Cir. 1970, 422 F.2d 95. We are inclined to believe that the court there may have based its opinion on a construction of the Virgin Islands statute. If it did not, then it is a stray.

18. While not necessary to a decision in this case, we have during our exploration run into some interesting observations regarding the defense of intoxication. In *State v. Kruchten,* supra, it was declared that drinking does not raise an issue to be submitted where the defendant takes the stand and is able to remember the factual details of the offense. In the case of Richmond, the defendant here, his testimony was replete with the minutest of details including plans made for the robbery, the precise arrangement of the room in which the murder took place, the direction the victim was lying on the floor when Nathan Jones shot him, exactly where the loot and guns were buried, how he wore gloves to avoid leaving fingerprints and a ski mask to cover identification and many more.

The court in *Kruchten* noted also that any experienced criminal lawyer is aware that juries seldom give more than scant attention to a plea that the accused committed the criminal act while or because he was intoxicated.

Also, in the Stanford Law Review article, supra, cited by defendant, it was acknowledged that in felony-murder cases, in practice, the defense of diminished capacity is unavailable to negate the intent element of the felony charged, where intoxication has not produced unconsciousness or where the mental defect or disease is not tantamount to insanity.

■■ The final point made by defendant is that the following offered but refused instruction should have been given to the jury:

"If the defendant is found not guilty by reason of insanity at the time of the commission of the offense, it then becomes the duty of the Court to direct the prosecuting attorney to file a petition as provided by Section 7–242, Wyoming Statutes 1957, to commit the defendant to the Wyoming State Mental Hospital. The defendant then would remain at the Wyoming State Mental Hospital until he is cured and it is deemed safe to release him; and when that time arrives he will be released and will suffer no further consequences from this offense."

The impropriety of such an instruction has already been settled by this court, initially in *Lonquest v. State*, Wyo.1972, 495 P.2d 575, cert. den. 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299, and more recently in *Duran v. State,* Wyo.1976, 546 P.2d 434.

There was no error.

Affirmed.

McCLINTOCK, J., filed a separate concurring opinion in which ROSE, J., joined.

ROSE, J., filed a separate concurring opinion.

McCLINTOCK, Justice, concurring in the result, in which ROSE, J., joins.

I concur completely in the affirmance of the conviction but cannot concur in the majority's refusal to consider appellant's contention that his confession was secured and used in violation of his Fifth Amendment rights and without the point having been raised in any way by appellant, deciding that the confession and use thereof did not violate Art. 1, § 11 of the Wyoming Constitution. I am firm in the belief that appellant has not established a violation of his Fifth Amendment rights, would so hold, and leave the matter there.

The course followed by the majority appears to me to ignore principles previously announced by this court that constitutional questions should not be considered unless specifically phrased and completely argued. *Doe v. Burk,* 513 P.2d 643 (Wyo.1973); *Johnson v. Schrader,* 507 P.2d 814 (Wyo. 1973); *Miller v. Board of County Commissioners of Natrona County,* 79 Wyo. 502, 337 P.2d 262 (1959). As I view it, the presentation of contentions under a specific clause of the federal constitution should not and does not open the whole question of constitutionality to such research and disposition as we may care to make of our own motion.

I do not deny the power and right of this court, provided only that it is convinced that consideration of questions not raised by counsel is necessary for a complete and just disposition of the case before it, of its own motion to raise such questions, whether constitutional or otherwise, but I think that we should rule upon them only after opportunity has been given to opposing counsel to present their views. There was no such possibility of plain error present in this case that I think we need to pose, then answer questions not raised.

I would further observe that notwithstanding the fact that appellant sought only to raise a point under the Fifth Amendment, possibly with the view of getting a ruling from the Supreme Court of the United States on that particular point, the majority opinion may very well impair the possibility of obtaining certiorari from that Court. The power of that Court to grant such writ under Title 28, § 1257(3) of the United States Code appears clear, but under its Rule 19, subd. 1(a) an important consideration in the grant of such writ is whether the state court "has decided a federal question of substance not theretofore determined by this court, or has decided it in a way probably not in accord with applicable decisions of this court." While I do not think that appellant has sustained his claim of violation of Fifth Amendment rights and believe the cases cited by the majority are more au-

thoritative on that point than they are on the construction of our Wyoming constitution, the majority leave the case with no decision at all upon the federal question. I do not think that in the interest of construing our own constitution we should interfere with appellant's presentation of federal claims to the proper federal court.

ROSE, Justice (specially concurring).

Justice McClintock objects to this court deciding a constitutional question not raised by the appellant and observes that the result of so deciding the appeal may be to jeopardize the defendant's United States Supreme Court rights of appeal. I concur —but I would add this:

The precise concept with which I find myself in disagreement is raised by the following from the majority's opinion:

"After examination of the record, we have great difficulty understanding the defendant's position that it was not established by the State during the trial that a tape-recorded confession and a transcript of the recording, signed by the defendant, were knowingly and voluntarily given under the Fifth Amendment to the Constitution of the United States. *Any holding we make in this regard will be made under a like provision of the Constitution of the State of Wyoming. Section 11, Article I, Wyoming Constitution, provides that: 'No person shall be compelled to testify against himself in any criminal case, * * *.'7"* [Emphasis supplied]

"7. Amendment V to the United States Constitution provides, ' * * * nor shall he [No person] be compelled in any criminal case to be a witness against himself. * * *.' "

I would and do concur in a result which says that neither the defendant's federal *nor* state constitutional rights were in fact violated. However, the query raised by the court's refusal to consider the federal constitutional issue relied on by the appellant and in our basing the decision in this appeal on a corollary state constitutional question *not* raised by the defendant is this:

Does the court's disposing of the appellant's federal constitutional claim under a corollary state constitutional provision have the effect of denying or jeopardizing his right of appeal to the United States Supreme Court?

Appellant urges that it was not established by the State during the trial that a tape-recorded confession and a transcript of the recording, signed by him, were knowingly and voluntarily given under the *Fifth Amendment of the United States Constitution.* I am in agreement with the majority opinion as it disposes of this claim by holding that appellant's confession was knowingly and voluntarily given in conformity with constitutional standards. However, while appellant charges a violation of his *Federal Fifth Amendment right,* the majority opinion, while relying in large part on an analysis of federal case authority, nevertheless, bases its decision solely upon the question of whether the defendant's rights under *Section 11, Article I, of the Wyoming Constitution* have been violated.

I have, in the past, expressed rather vociferous concern with our inclination, in certain instances, to decide appeals on issues not raised by the parties. *Simpson v. Petroleum, Inc.,* Wyo., 548 P.2d 1; and *Allen v. Allen,* Wyo., 550 P.2d 1137.

In *Simpson,* where the majority decided that the defendants' fair-trial guarantee had been abused by inadequate notice of hearing, I dissented—not because I do not seek to jealously guard the right to fair trial *but because that issue was not raised in the appellate process*—at least I did not think it was.

In *Allen,* supra, the majority decided the appeal, in part at least, on the doctrine of judicial estoppel when that affirmative defense had never been asserted, relied upon

or argued. This language from the majority in *Allen* frightened me then and frightens me now:

> "*We are not a bit concerned that the matter of judicial estoppel was not raised in the lower court or argued by either of the parties. This court has general superintending control over all the courts of the state* [citing, by footnote 4, Section 2, Article V, Wyoming Constitution] *and the Wyoming judicial system in general. It is our duty to protect its integrity and prohibit dealing lightly with its proceedings. We are at liberty to decide a case upon any point which in our opinion the ends of justice require, particularly on a point so fundamental that we must take cognizance of it.*" [Emphasis and parenthetical matter supplied]

I understand this to say that this court will first decide what the ends of justice are and then tailor its decisions to fit them—no matter whether the parties raise such issues as we later decide are compatible with what we envision "the ends of justice" to be or not. This theory of appellate review and decision-making conceives of excessive and unauthorized power in this court, which I reject.

Where does this unbridled power lead us? It leads inevitably to the never-never land in which we have arrived in the instant matter. For me, the majority opinion in the case at hand stands for this proposition:

> Even though the defendant has urged as an appellate issue a violation of his federal constitutional rights, we—out of hand—refuse to even consider that and, instead, substitute an issue *not* raised by the appellant *but chosen by us,* namely, a corollary state constitutional question.

I know of no philosophy of the law, absent plain error or a jurisdictional defect, which I can embrace that authorizes an appellate court to do this—especially where the effect is to place in jeopardy rights which the appellant has sought to protect

in the appellate process. There are no case or encyclopedia citations furnished by the majority which support its decision to discard the theory of appellant's appeal and to substitute a theory of this court's choosing.

Besides being questionable appellate practice, the result here—in my judgment—places in real and practical jeopardy the appellant's right of appeal to the United States Supreme Court.

### Review by the United States Supreme Court

The jurisdiction of the United States Supreme Court to review the final judgment of the highest court of a state in which a decision could be had is defined in 28 U.S.C.A., § 1257(3). Under this section review is possible by writ of certiorari where any title, right, privilege or immunity is specially set up or claimed *under the Constitution of the United States.* There is no requirement that the state court shall have decided the federal question in a particular way. R. Robertson and F. Kirkham, Jurisdiction of the Supreme Court of the United States, § 15 (R. Wolfson & P. Kurland ed. 1951).

Standards governing the exercise of the Supreme Court's discretionary power of review upon writ of certiorari are set forth in U.S.Sup.Ct. Rule 19, 28 U.S.C.A. It provides in pertinent part:

> "1. A review on writ of certiorari is not a matter of right, but of sound judicial discretion, and will be granted only where there are special and important reasons therefor. The following, while neither controlling nor fully measuring the court's discretion, indicate the character of the reasons which will be considered:
>
> > "(a) *Where a state court has decided a federal question of substance not theretofore determined by this court, or has decided it in a way probably not in accord with applicable decisions of this court.*" [Emphasis supplied]

As the foregoing rule indicates, the petitioner is obliged to show that a *substantial federal question exists*. Rice v. Sioux City Memorial Park Cemetery, 349 U.S. 70, 74, 75 S.Ct. 614, 616, 99 L.Ed. 897 (1955). Further, in illustrating the character of reasons which may be deemed "special and important," the rule refers to cases involving a *federal question* which either is of first impression or has been erroneously decided in the state court.[1] It then becomes clear that if this court had actually decided the federal question raised by appellant's claim, it could have been reviewed on a writ of certiorari in the United States Supreme Court, provided that this case would there be considered as one in which there are special and important reasons for granting the writ.[2] Since this court did not decide the federal question, the jurisdiction of the United States Supreme Court to review this case on a writ of certiorari is automatically foreclosed.

It may, therefore, be concluded that the majority's decision to disregard the federal constitutional grounds raised by the appeal and to adopt a state constitutional question *not* raised is to foreclose to the appellant one avenue of the appellate process absolutely—namely, the writ of certiorari. This is so because the posture of this opinion now is that there has been no state supreme court decision upon a title, right, privilege or interest claimed under the Constitution of the United States.

It is conceded that a right of review can be predicated on the failure of the highest state court to pass on a federal question provided the question was properly presented in the state courts. Street v. New York, 394 U.S. 576, 583, 89 S.Ct. 1354, 1361, 22 L.Ed.2d 572 (1969); Bailey v. Anderson, 326 U.S. 203, 207, 66 S.Ct. 66, 68, 90 L.Ed. 3d (1945); 36 C.J.S. Federal Courts § 274(2) and cases cited therein. Whether a federal question was sufficiently and adequately raised in the state court is itself ultimately a federal question, and the Supreme Court is not bound by the decision of the state court.[3] Street v. New York, supra, 394 U.S. at 583, 89 S.Ct. 1354.

In the case at bar, since appellant raised an objection at trial over the admissibility of the tape-recorded confession and signed statement, and then later raised the related constitutional question as an issue on appeal, there is no doubt that the federal question was properly presented as a matter of state procedure. Appellant, therefore, could predicate review on the failure of this court to pass on his federal constitutional claim. *However, this shades into the inquiry of whether or not the majority decision rested upon an adequate state ground.*

It is a well-established principle that the United States Supreme Court will decline to review judgments of state courts which rest on adequate and independent state grounds even where these judgments also decide federal questions. Murdock v. City of Memphis, 87 U.S. 590, 20 Wall 590, 636, 22 L.Ed. 429 (1875); Henry v. State of Mississippi, supra note 3, 379 U.S. at 446, 85 S.Ct. 564; and Herb v. Pitcairn, 324 U.S. 117, 125, 65 S.Ct. 459, 463, 89 L.

---

1. The considerations listed in Rule 19 are illustrative but not exhaustive of the factors which preclude adjudication on the merits of cases which may have the appearance of public importance. *Rice v. Sioux City Memorial Park Cemetery*, supra.

2. I grant it to be conceivable that appellant's petition for a writ of certiorari might be denied. In light of the recent decisions of the Supreme Court limiting the application of Miranda standards, this case might be regarded as not presenting a substantial federal question of special importance. See *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 324, 46

L.Ed.2d 313 (1975) (Brennan, J., dissenting); and *Baxter v. Palmigiano,* —— U.S. ——, 96 S.Ct. 1551, 1568, 47 L.Ed.2d 810 (1976) (Brennan, J., dissenting).

3. In such cases, however, the determination is whether the state court has bypassed the federal right under forms of state procedure. See, e. g., *Street v. New York*, supra 394 U.S. at 583, 89 S.Ct. 1354; *Douglas v. State of Alabama*, 380 U.S. 415, 422, 85 S.Ct. 1074, 1078, 13 L.Ed.2d 934 (1965); *Henry v. State of Mississippi*, 379 U.S. 443, 447, 85 S.Ct. 564, 567, 13 L.Ed.2d 408 (1965).

Ed. 789 (1945). The state ground must not be without any fair or substantial support. *Ward v. Board of County Com'rs,* 253 U.S. 17, 22, 40 S.Ct. 419, 421, 64 L.Ed. 751 (1920). Where the decision of the state court rests on substantive grounds,

"... the determination of the federal question cannot affect the disposition if the state court decision on the state law question is allowed to stand. Under the view taken in *Murdock* of the statutes conferring appellate jurisdiction on this Court [United States Supreme Court], we have no power to revise judgments on questions of state law. Thus, the adequate nonfederal ground doctrine is necessary to avoid advisory opinions."[4] *Henry v. State of Mississippi,* supra note 3, 379 U.S. at 446–447, 85 S.Ct. at 567. [Bracketed matter supplied]

Therefore, the review by the United States Supreme Court on the merits can be precluded if the state court decides the case exclusively on some ground of state law and never reaches a federal question present in the case.[5]

In determining the adequacy of state grounds for decision, the United States Supreme Court applies its own criteria and determines the inquiry for itself. In *Abie State Bank v. Weaver,* 282 U.S. 765, 773, 51 S.Ct. 252, 255, 75 L.Ed. 690 (1931), the Supreme Court stated:

"... [T]he federal ground being present, it is incumbent upon this court, when it is urged that the decision of the state court rests upon a nonfederal ground, to ascertain for itself, in order

that constitutional guarantees may appropriately be enforced, whether the asserted nonfederal ground independetly and adequately supports the judgment. ..."

Since the majority decides the issue raised by appellant's claim on state constitutional grounds, application of the adequate state ground doctrine could result in the denial of the United States Supreme Court's jurisdiction to review appellant's claim as a matter of federal constitutional law.

The overriding principle disposing of the issue discussed above is the adequate state ground doctrine. It is, in my opinion, very probable that the Supreme Court would apply the doctrine in this case to deny appellant review of his federal claim. The recent trend of that Court has been to remove many of their cases out of the federal jurisdiction.

If there is even a possibility that the effect of what we have done in ignoring the federal ground of appeal and adopting the state constitutional ground is to deny and hinder the defendant's access to the United States Supreme Court, I would conclude that our action in this appeal is arbitrary and without authority.

Not only do I voice objection to decision-making upon grounds not urged by the appellant as a matter of appellate principle, but in this appeal I find the path of appeal to the United States Supreme Court to be truly inhibited by our employment of this practice, and, therefore, I cannot agree with the majority decision.

---

4. See also *Herb v. Pitcairn,* supra, 324 U.S. at 125–126, 65 S.Ct. 459, and the reasons for adequate state ground rule stated therein.

5. These cases are usually those in which the state court has held that the state constitution has been violated and thus does not consider it necessary to discuss the federal question. See, e. g., *So. Burlington Cty. N.A.A.C.P. v. Tp. of Mt. Laurel,* 67 N.J. 151, 336 A.2d 713, cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975). Some state courts in recent years have imposed

higher standards under their state constitutions than is required by the federal constitution. See cases cited in the dissenting opinions of Justice Brennan in *Michigan v. Mosley,* supra note 2 at 334, and in *Baxter v. Palmigiana,* supra note 3, 96 S.Ct. at 1568. However, research does not produce any reported decisions whereby the Supreme Court declined review where the state court held its state constitution was not violated without discussing the federal constitutional provision asserted.

I concur in the result reached by the majority, concur in the concurring opinion of McCLINTOCK, J., but reject the method by which the majority comes to its conclusions for all the reasons stated above.